**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**J.B. HUNT TRANSPORT, INC.**                                        **PLAINTIFF**

**vs.**                          **CASE NO. 5:26-cv-05053-DCF**

**HOUSTON CASUALTY COMPANY;
CHAUCER INSURANCE COMPANY DAC; and
LLOYD'S SYNDICATE CHAUCER 1084**                      **DEFENDANTS**

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, J.B. Hunt Transport, Inc. (J.B. Hunt"), by its attorneys, Friday, Eldredge & Clark, LLP, for its Complaint for Declaratory Judgment states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff J.B. Hunt Transport, Inc. is a corporation organized under the laws of the State of Georgia, having its principal place of business in Lowell, Arkansas.

2.      Defendant Houston Casualty Company ("HCC") is a Texas company with its principal place of business in Texas.

3.      Defendant Chaucer Insurance Company DAC is, upon information and belief, an Ireland-domiciled insurance company that sells and secures insurance for entities in the United States.

4.      Defendant Lloyd's Syndicate Chaucer 1084 ("Chaucer 1084") is, upon information and belief, a London, England-based insurance company that sells and secures insurance for entities in the United States.

5.      Each Defendant subscribed to the Logistics Operators Policy No. 38675622AA (the "Policy") issued to J.B. Hunt for the Policy period of December 31, 2022, to December 31, 2023. *See* **Exhibit A**, Logistics Operators Policy No. 38675622AA.

6.      The Policy was issued in Northwest Arkansas. Specifically, J.B. Hunt communicated from its office in Lowell, Arkansas, directly with a local Fayetteville, Arkansas insurance broker regarding limits, terms, and premiums for the Policy.  *See* **Exhibit B**, Email Communications between J.B. Hunt and McGriff Insurance Services, Inc.  Additionally, J.B. Hunt accepted the terms of the Policy and agreed to be bound by those terms via email sent from Lowell, Arkansas to the broker in Fayetteville, Arkansas.  *Id*.  Because both Lowell and Fayetteville are located in the United States District Court for the Western District of Arkansas, Fayetteville Division, jurisdiction and venue are proper in this Court.

7.      Additionally, this Court has personal jurisdiction over the Defendants in this matter because Defendants intentionally directed activities toward the state of Arkansas, including selling the Policy in Arkansas to Plaintiff, engaging with an insurance broker located in Arkansas to sell the Policy, and causing the Policy to be issued in Arkansas.  Further, other parts of the Policy include a forum selection clause allowing for jurisdiction "the United States District Court in the district in which [the Policy] was issued," meaning Defendants anticipated being haled into court in the United States District Court for the Western District of Arkansas.  *See* Ex. A. § 32, p. 18.

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy, exclusive of costs and interest, exceeds $75,000.

9.      Venue is proper in the Fayetteville Division of the Western District of Arkansas pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in Lowell, Arkansas, and Fayetteville, Arkansas, within the Fayetteville Division of the Western District of Arkansas, where J.B Hunt and the insurance broker for the Policy are located, and where communications related to the terms of the Policy and the agreement to be bound by terms of the Policy occurred.  *See* Ex. B.

## STATEMENT OF FACTS

***The Underlying Lawsuit***

10.     On April 2, 2024, a lawsuit (hereinafter, the "Underlying Lawsuit") was filed against J.B. Hunt, motor carrier Borderlanders, Inc. ("Borderlanders"), and Borderlanders' driver, Shokhijakhon Bekmuradov ("Bekmuradov") in the United States District Court for the District of Arizona. *See* **Exhibit C**, Complaint for Negligence, *Crystal Gee, et al. v. J.B. Hunt Transport, Inc., et al.*, No. CV-24-08064-PCT-SMM.

11.     The plaintiffs in the Underlying Lawsuit allege claims for injuries sustained in, and wrongful death stemming from, an automobile accident that occurred on October 10, 2023, in Arizona. *Id*.

12.     The plaintiffs in the Underlying Lawsuit allege that Bekmuradov, Borderlanders' driver, was negligent when he attempted to pass a recreational truck and trailer, ignored the end of a passing zone, and continued into the lane of oncoming traffic in a no passing zone, where his tractor trailer collided head on with a family of five coming from the opposite direction. *Id.* at ¶¶ 27-29.

13.     The plaintiffs in the Underlying Lawsuit also allege that J.B. Hunt had an Outsource Carrier Agreement with Borderlanders, through which J.B. Hunt, as a transportation broker, arranged for Borderlanders' trucks and drivers to transport property for J.B. Hunt customers, and specifically that J.B. Hunt arranged for Borderlanders to transport medical equipment from Denver, Colorado, to Phoenix, Arizona. *Id.* at ¶¶ 20-24.

14.     The plaintiffs in the Underlying Lawsuit allege that J. B. Hunt is liable for negligent hiring, supervision, entrustment, and retention of Borderlanders due to the broker-carrier relationship between J.B. Hunt and Borderlanders. *Id.* at ¶ 38.

15.     The plaintiffs in the Underlying Lawsuit further allege, in the alternative, that in

this instance because J.B. Hunt was authorized to ship as a motor carrier, J.B. Hunt acted also as a motor carrier, and J.B. Hunt had a nondelegable duty to safely operate its transportation services on public highways. *Id.* at ¶¶ 35-37.

16.     J.B. Hunt has appeared and defended on its own behalf in the Underlying Lawsuit.

17.     J.B. Hunt did not act as a motor carrier with respect to the circumstances giving rise to the Underlying Lawsuit, because J.B. Hunt was not the entity directly operating the truck involved in the accident.  Rather, J.B. Hunt acted as a transportation broker operating under its brokerage authority by arranging for the transportation of cargo by Borderlanders, a motor carrier.

18.     J.B. Hunt's relationship with Borderlanders was set forth in an Outsource Carriage Agreement.  *See* **Exhibit D**, Outsource Carrier Agreement ("Agreement"). Pursuant to the Agreement, Borderlanders agreed to transport cargo and performed such services as an independent contractor.  *Id*. § 2.1.

19.     The accident occurred while Borderlanders was transporting cargo on public roads within the United States pursuant to that Agreement.

***The Policy***

20.     J.B. Hunt accepted the terms of the Policy and agreed to be bound by the Policy on December 20, 2022, via email communications between Michelle Easterling of McGriff Insurance Services Inc.'s Fayetteville, Arkansas office and Eric McConnell of J.B. Hunt.  *See* Ex. B.

21.     Defendants are subscribers to the Policy.  *See* Ex. A, p. 1.

22.     The Policy went into effect on December 31, 2022, for the Policy period of December 31, 2022, to December 31, 2023.

23.     The Policy provided a $5,000,000 per occurrence limit of transportation broker liability coverage in excess of a $2,000,000 deductible.  *See* Ex. A, p. 2.

24.     Specifically, Clause 82 states that the Policy "insures [J.B. Hunt] for liability arising from [its] service as a transportation broker where such service includes the arrangement for the transportation of cargo on a public road in the USA or Canada by a motor carrier which you hire." *See* Ex. A, § 82, p. 44.

25.     The claims in the Underlying Lawsuit trigger coverage under Clause 82 of the Policy because J.B. Hunt provided services as a transportation broker when it arranged for the transportation of cargo by Borderlanders, a motor carrier J.B. Hunt hired, on a public road in the United States.

26.     Because J.B. Hunt provided services as a transportation broker, any liability assessed against J.B. Hunt in the Underlying Lawsuit is covered under Clause 82.

***Defendants Failure To Provide Coverage as Required Under The Policy***

27.     Defendants acknowledge that J.B. Hunt has been sued in the Underlying Lawsuit as a broker.  *See* **Exhibit E**, December 18, 2025, Letter, p. 1.

28.     Despite this acknowledgment and the applicability of Clause 82 of the Policy to the Underlying Lawsuit, Defendants have reserved the right to deny coverage to date, choosing to rely on the alternative allegations of plaintiffs in the Underlying Lawsuit rather than the plain language of the Policy.

29.     Specifically, Defendants' position is that coverage under Clause 82 "is expressly limited to J.B. Hunt's broker capacity and does not extend to liability if J.B. Hunt is determined to act as a motor carrier."  *See* Ex. E, p. 8.  If the court in the Underlying Lawsuit determines that "J.B. Hunt's liability arises from/is based on its provision of services as a transportation broker in arranging carriage by Borderlanders, coverage may apply under this clause… [h]owever, if J.B. Hunt's liability arises from/is based on activities performed as a motor carrier, Clause 82 does not apply, and coverage is denied under the Policy on that basis."  *Id*. p. 8-11.

30. Defendants' position violates the plain language of the Policy.

31. The plain language of Clause 82 of the Policy is simple and straightforward: coverage is triggered if potential liability arises in connection with J.B. Hunt's provision of services as a transportation broker by hiring a motor carrier to transport cargo on public roads within the United States. *See* Ex. A, § 82, p. 44.

32. Clause 82 of the Policy does not require that a lawsuit be filed against J.B. Hunt in order to trigger coverage. Clause 82 likewise does not indicate that coverage will be provided only if a court determines that J.B. Hunt was acting as a transportation broker related to the potential liability.

33. In fact, Clause 82 contains no precondition, limitation, or language that would exclude coverage once J.B. Hunt has provided services as a transportation broker by hiring a motor carrier to transport cargo on public roads within the United States. *Id.*

34. Thus, coverage is triggered here irrespective of the Underlying Lawsuit or the allegations made therein. And the alternative allegations made in the Underlying Lawsuit are irrelevant to whether Defendants must provide coverage to J.B. Hunt.

35. Defendants' refusal to provide coverage now based on an alternative theory argued by plaintiffs in the Underlying Lawsuit is without merit.

36. But even if those allegations were relevant, plaintiffs in the Underlying Lawsuit have alleged that J.B. Hunt acted as a broker (Ex. C, ¶¶ 20-24, 37-38), and those allegations are sufficient to trigger coverage under Clause 82.

37. Defendants' December 18, 2025, Letter demands, without any citation to a term in the Policy, that "J.B. Hunt's motor carrier liability insurers and/or the Assured itself… are required to respond for this claim in conjunction with any coverage which may potentially be provided under [T]he Policy." Ex. E, p. 13.

38.     This demand is not supported by the Policy, which does not contain any term addressing the interaction between coverage provided by Clause 82 and other coverage available to J.B. Hunt.

39.     Defendants' December 18, 2025, Letter also denies coverage for any portion of claims in the Underlying Lawsuit seeking punitive, exemplary, penalty, or multiple damages. Ex. E, p. 6. To support this position, Defendants cite Clause 40.12. *Id*.

40.     However, Clause 40.12 is found in Section 1 of the Policy, titled "Applicable to Freight Services Liability." Ex. A. § 40.12, pp. 14, 24.

41.     Clause 82 is found in Section 5 of the Policy, titled "Applicable to Transportation Brokers Liability." *Id*. § 82, p. 44.

42.     No language in Clause 82 incorporates the punitive damages exclusion contained in Clause 40.12 or any other provision of any other section of the Policy. As a result, Clause 40.12 does not apply here.

43.     On January 19, 2026, counsel for J.B. Hunt sent a letter to Defendants requesting that Defendants provide additional information and evidence in support of their coverage position. Specifically, J.B. Hunt requested that Defendants confirm their positions as to whether J.B. Hunt hired Borderlanders to transport cargo, and whether J.B. Hunt acted as a transportation broker within the meaning of Clause 82 in hiring Borderlanders, and to provide all evidence to support their position. J.B. Hunt also requested that Defendants identify all language in Clause 82 that Defendants contend precludes coverage in the Underlying Lawsuit and to explain the basis for their position that J.B. Hunt was not acting as a transportation broker, including the definition of the term "transportation broker" that Defendants rely upon to interpret Clause 82. *See* **Exhibit F**, January 19, 2026, Letter.

44.     Despite Defendants' acknowledgement of receipt on January 19, 2026, and J.B. Hunt's request for a response by January 22, 2026, as of the date of this filing, Defendants have not responded to J.B. Hunt's requests for information and have not provided any of the requested information.

## COUNT I - DECLARATORY JUDGMENT

45.     J.B. Hunt adopts and fully incorporates the foregoing paragraphs of this Complaint as if set forth herein word for word.

46.     J.B. Hunt obtained coverage under the Policy for the period of December 31, 2022, to December 31, 2023, which was secured by Defendants.

47.     The Underlying Action stems from an incident that occurred on October 10, 2023, which was during the coverage period of the Policy.

48.     Pursuant to the Policy, particularly Clause 82, Defendants are obligated to provide coverage to J.B. Hunt in relation to the Underlying Lawsuit.

49.     J.B. Hunt has demanded that Defendants assume their responsibilities and obligations under the Policy.

50.     To date, Defendants have failed to assume their responsibilities and obligations under the Policy by failing to provide coverage to J.B. Hunt in relation to the Underlying Lawsuit.

51.     J.B. Hunt also has requested that Defendants provide evidence or additional information in support of their coverage position, and Defendants have failed to provide a meaningful response.

52.     As a result, there is an actual existing controversy between J.B. Hunt and Defendants.

53.     J.B. Hunt is entitled to a declaration that Defendants are required to provide coverage to J.B. Hunt pursuant to the terms of the Policy because J.B. Hunt acted as a

"transportation broker" in connection with and with respect to the accident that gives rise to the Underlying Lawsuit.

54.     J.B. Hunt reserves the right to amend this Complaint for Declaratory Judgment and reserves the right to rely on each and every other provision of the Policy, whether or not specifically identified herein.

WHEREFORE, Plaintiff J.B. Hunt respectfully requests that the Court enter a declaratory judgment finding that Logistics Operators Policy No. 38675622AA affords coverage for the benefit of J.B. Hunt with respect to the allegations made against it in the Underlying Lawsuit titled *Crystal Gee, et al. v. J.B. Hunt Transport, Inc., et al.*, case no. CV-24-08064-PCT-SMM, filed in the United States District Court, District of Arizona, Division 1, for its attorneys' fees, and for all other proper and just relief to which J.B. Hunt may show itself to be entitled.

Respectfully submitted,

Katie Campbell

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
Alexa R. Mizer, Ark. Bar No. 2022066
Friday, Eldredge & Clark, LLP
3350 S. Pinnacle Hills Pkwy, Suite 301
Rogers, AR 72758
Telephone: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com
amizer@fridayfirm.com

*Attorneys for Plaintiff*

# EXHIBIT A



**LOGISTICS OPERATORS POLICY**

| | |
|---|---|
| UMR | B0180MA2307074 |
| Policy Number | LDCH000006-00 |

| | | |
|---|---|---|
| **Insured (Clause 2)** | | |
| | J.B. Hunt Transport, Inc.   PO Box 598, Attn: Julie Allred, Lowell, AR 72745 | |
| **Agent (Clause 15 )** | | **Commission 0%** |
| | McGriff - Portland, OR | |
| **Goods Insured** | Goods of every description incidental to the Insured's business consisting principally of, but not limited to: Freight all kinds. | |
| **Attachment Date (Clause 4)** | December 31, 2023 , 12:01 a.m. standard time at the mailing address shown on the marine open cargo policy declarations and to remain in force continually until December 31, 2024. | |
| **Cancellation (Clause 4)** | 90  days notice of cancellation and nonrenewal | |
| **Geographic limits** | To be insured lost or not lost, except to the extent coverage is prohibited by United States of America Law, or United States of America decree, at and from ports and / or places in the world to ports and /or places in the World, Including the risk of transhipment by land, air, water or otherwise; including intercostal and coastwise shipments via water. Also including overland shipment worldwide, and overland shipment beginning and ending within the 48 contiguous states of the United States, the District of Colombia, Mexico, and Canada. | |
| **Premium** **(clause 3)** | ███████████    ████ ████████████    ████  ██ ██████████████████ | |
| **Payment Plan** | Lump Sum | |
| **Schedule Of Rates** | Legal Liability                    N/A | |
| **Reporting Method** | Flat              GFRs | |
| **Valuation** **(Clause 14)** | As per Policy form except as follows: | |
| **Security** | 50% Chaucer 1084 and 50% Houston Casualty Company | |

| **Limits of Liability** | | |
|---|---|---|
| **Legal Liability** **(Clause 5)** | Not Covered | Freight Forwarder as agent (by air, rail, road and ocean) |
| | Not Covered | Ocean Freight Forwarder as principal |
| | | (i.e. Contracting Carrier issuing house bills of lading - NVOCC) |
| | Not Covered | Air Freight Forwarder as principal |
| | | (i.e. as Contracting Carrier issuing house air waybills) |
| | Not Covered | Contingent Motor Truck Cargo per Truck |
| | Not Covered | Motor Truck Cargo per Truck |
| | Not Covered | Warehouse Keepers Liability |
| | n/a | While at any one  Scheduled Warehouse |
| | n/a | While at any one  UnScheduled Warehouse |
| | Not Covered | Debris Removal  limit of |
| | Not Covered | Legal costs and Expenses |
| | Not Covered | Loss Mitigation Costs & Expenses limit of indemnity |
| | Not Covered | Restricted Cargo Limit of indemnity |
| | **If there is no limit stated, no coverage is provided.** | |

| | |
|---|---|
| **Limit of liability**<br>**Errors and**<br>**Omissions**<br>**(Clause 79)** | $    1,000,000  Per occurrence and in the aggregate excess of deductible |
| **Limit of liability**<br>**3rd Party including**<br>**Personal Rights & Advertising**<br>**(Clause 80)** | $    5,000,000  Per occurrence excess of deductible |
| **Limit of liability**<br>**Contingent Auto**<br>**(Clause 82)** | $    5,000,000  Per occurrence excess of deductible |
| **DEDUCTIBLES**<br>**(Clause 6)** | n/a              Legal Liability  - Per occurrence<br>$    2,000,000  Legal Expenses<br>n/a              Transit shippers interest - Per occurrence<br>n/a              Storage - Per occurrence<br>n/a              Cat Perils - Per occurrence<br>$    2,000,000  Errors and Omissions - per occurrence<br>$    2,000,000  Contingent Auto<br>$    2,000,000  Third Party Liabilities |
| **AVERAGE TERMS**<br>**(Clause 51 )** | As per Policy terms except as follows: |
| **FORMS AND**<br>**ENDORSEMENTS** | Logistics Operators  Policy Declarations<br><br>Strikes, Riots & Civil Commotions Endorsement<br>Chemical, Biological, Bio-Chemical, Electromagnetic Terrorism Exclusion<br>U.S. Economic and Trade Sanctions Clause<br>Claims Reporting<br>Blanket Additional Insured<br>Blanket Waiver of Subrogation<br>Blanket Primary/Non-Contributory<br>Blanket 90 Days Notice of Cancellation and Non-Renewal<br>Named Additional Insured Endorsement |
| **SUBJECTIVITIES** | *Retro Clause*    Total claims divided by 60%<br>A 60% loss ratio for 23-24 is defined as $597K in claims paid and incurred.<br>Time Period - 12 months after the policy expiry or once a claim is formally closed<br>Subject to an overall premium cap of $1,500,000 per annum |

Signed By:  _____



**General Conditions Applicable to the entire policy:**

1. **DUTY OF DISCLOSURE**

   Before entering into a contract of insurance with an insurer, an assured has a duty to disclose to the insurer every matter known to them, or could reasonably be expected to be known to them, which is relevant to the insurer's decision on whether to accept the risk of the insurance and, on what terms.  An assured has the same duty to disclose those matters to the insurer before a contract of insurance is renewed or extended or varied or reinstated.

   An assured's duty does not require disclosure of a matter that diminishes the risk to be undertaken by the insurer, or that is of common knowledge, or that the insurer knows or in the ordinary course of its business as an insurer ought to know, or as to which compliance with this duty of disclosure is waived by the insurer.

   The duty to disclose a matter applies until the proposed contract is entered into.

   If an assured fails to comply with their duty of disclosure or make a misrepresentation to the insurer, the insurer may be entitled to reduce its liability under the contract in relation to a claim and/or may cancel the contract.  If the non-disclosure or misrepresentation is fraudulent, the insurer may also have the option of refusing to pay a claim and treating the contract as having never commenced.

2. **INSURED**

   **"As Per Declaration Page"** and its subsidiary, affiliated and interrelated companies, and joint ventures, as their respective interests may appear (hereinafter referred to as the "Insured").

3. **PREMIUM**
   This policy is issued in consideration of Annual Deposit Premium payable at rates and terms **"As Per Declaration Page".** This deposit shall be due and payable and payment made within 30 days of the invoice date.

   A new deposit will be determined for each succeeding year prior to the anniversary of the policy. The Insured shall report to DUAL Commercial at anniversary, or as soon as possible thereafter, the actual sales or values stated in the policy as the applicable rating basis for the period and the earned premium shall be calculated thereon .

In the event the earned premium is in excess of the deposit, the Insured shall remit the additional premium to DUAL Commercial.

If this policy is cancelled prior to anniversary, the Insured shall render a final report of values or sales up to the date of cancellation. The premium shall be calculated by applying the rate for the policy period to the final actual values or sales. If the calculated premium is less than the prorated minimum premium, then no return premium is due.

## 4. ATTACHMENT AND CANCELLATION

To attach on each shipment made on and/or after "**As Per Declarations Page**", and to remain in force continuously thereafter until cancelled. Subject to forty five (45) days written Notice of Cancellation, at last known address, by either party for Marine Risks.

Subject to forty-eight (48) hours written Notice of Cancellation, at last known address, by either party for War Risks and Strikes, Riots, and Civil Commotions.

Notwithstanding the foregoing, DUAL Commercial may effect ten (10) day written Notice of Cancellation, at last known address, at any time when any premium is past due. Notice, if given, not to apply to any shipment which shall have commenced or goods which have been dispatched prior to issuance of such notice.

## 5 POLICY LIMITS

Unless otherwise agreed DUAL Commercial shall not be liable under this policy for more than:

"As Per Declarations Page" per any one conveyance, connecting conveyance, craft or at any place at any time.

If the total value at risk exceeds the applicable limit of liability provided by this policy, the Insured shall nevertheless report to DUAL Commercial the full amount at risk and shall pay full premium thereon. The acceptance by DUAL Commercial of such reports and premium shall not alter or increase the limits of DUAL Commercial's liability, but DUAL Commercial shall be liable for the full amount of loss up to but not exceeding the applicable limit of liability.

If a claim arises from more than one risk, the limits will be applied to the highest limit per risk, unless an aggregate applies, the overall limit will be a combined single limit.

## 6    DEDUCTIBLE

A deductible of "As Per Declarations Page" shall apply to any one loss (defined as a single accident or occurrence); however, this deductible shall not apply to survey fees, general average, salvage or special charges, loss, damage or expense covered under Sue and Labor, Debris Removal, Total Loss or Constructive Total Loss.

## 7 RESTRICTED CARGO

1) Any time sensitive or critical written material or documents for example, but without prejudice to the generality of this clause, bids and/or contract proposals and/or designs and/or patterns and/or plans and/or manuscripts and all other documents.

2) Antiques and/or Fine Art unless the individual item value is less than **USD 1000**.

3) Alcoholic beverages, with the exception of beer and wine.

4) Bulk cargoes of every description unless carried in ISO tank containers or purpose built road or rail tank conveyances.

5) Cigarettes, cigars and any other tobacco products.

6) Computer chips and/or Computer Processing Units (CPU's) and/or lap top computers and/or mobile/cellular telephones and/or MP3 players.

7) Deeds and/or securities and/or treasury notes and/or any other cash equivalents and/or tickets and/or vouchers and/or stamps and/or duty stamps and any other documents negotiable or equivalent as cash.

8) Jewelry and/or watches unless the individual item value is less than **USD500**.

## 8 EXCLUDED CARGO

1) Money and/or coins of every description.

2) Livestock and/or bloodstock and/or living creatures.

3) Precious Metals and items that are made from or which may include Precious Metals

4) Precious or Semi-precious Stones or items that are made from or which may include Precious or Semi-precious Stones

5) Any Cargo whilst being transported under its' own power or whilst being towed on its' own axle for example, but without prejudice to the generality of this clause, motor vehicles, motor cycles, caravans, horse boxes and trailers.

6) Any Cargo that is owned or hired by or leased or loaned to the Assured

## 9 U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

## 10. EXCLUSIONS

This policy excludes loss, damage or expense directly or indirectly caused by, contributed to or resulting from:

A. wear and tear, inherent vice, latent defect or gradual deterioration;

B. delay, loss of market, loss of use or business interruption;

C. any of the perils excluded in the Paramount Warranties below including:

(i) Free of Capture and Seizure

(ii) Strikes, Riots and Civil Commotions

(iii) Extended Radioactive Contamination Exclusion

(iv) Radioactive Contamination Exclusion (U.S.A. Endorsement)

D. misappropriation, secretion, conversion, infidelity or an dishonest act on the part of the Insured or their employees.

## 11. PARAMOUNT WARRANTIES

The following warranties shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by these warranties and expressly assumes the said risks.

A. F.C. & S. (Free of Capture and Seizure) Warranty

It is warranted that this insurance shall not cover loss, damage, liability or expense directly or indirectly caused by, contributed to, or resulting from:

(i)     Capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise;

(ii)    (a) any weapon of war employing atomic or nuclear fission and/or fusion and/or other reaction or radioactive force or matter or (b) any mine or torpedo, whether in time of peace or war.

(iii)    All consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power.

(iv)    The consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; or from the consequences of the imposition of martial law, military or usurped power; or piracy.

## B. SR & CC (Strikes, Riots and Civil Commotions) Warranty

It is warranted that this insurance shall not cover loss, damage, liability or expense directly or indirectly caused by, contributed to, or resulting from:

(i)     strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrence or disorders;

(ii)    vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

## C. Extended Radioactive Contamination Exclusion

It is warranted that this insurance shall not cover loss, damage, liability or expense directly or indirectly caused by, or contributed to, or resulting from:

(i)     ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

(ii)     the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

(iii)    any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

(iv)     the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

D. Radioactive Contamination Exclusion (U.S.A. Endorsement)

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that if fire is an insured peril and where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions and a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 16C(i), 16C(ii), 16C(iii), and 16C(iv) of the Extended Radioactive Contamination Exclusion Clause any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.


E. MARINE CYBER ENDORSEMENT

Subject only to paragraph 3 below, in no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means for inflicting harm, of any computer, computer system, computer software programme, malicious code, computer virus, computer process or any other electronic system.

Subject to the conditions, limitations and exclusions of the policy to which this clause attaches, the indemnity otherwise recoverable hereunder shall not be prejudiced by the use or operation of any computer, computer system, computer software programme, computer process or any other electronic system, if such use or operation is not as a means for inflicting harm.

Where this clause is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, paragraph 1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software programme or any other

electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.

LMA5403

11 November 2019

F. COMMUNICABLE DISEASE EXCLUSION JC2020-011 17 April 2020

1.  Notwithstanding any provision to the contrary within this insurance, this insurance does not insure any loss, damage, liability, claim, cost or expense of whatsoever nature caused by, contributed to by, resulting from, arising out of, or in connection with a Communicable Disease or the fear or threat (whether actual or perceived) of a Communicable Disease regardless of any other cause or event contributing concurrently or in any other sequence thereto.

2.  As used herein, a Communicable Disease means any disease which can be transmitted by means of any substance or agent from any organism to another organism where:

    2.1.  the substance or agent includes, but is not limited to, a virus, bacterium, parasite or other organism or any variation thereof, whether deemed living or not, and

    2.2.  the method of transmission, whether direct or indirect, includes but is not limited to, airborne transmission, bodily fluid transmission, transmission from or to any surface or object, solid, liquid or gas or between organisms, and

    2.3.  the disease, substance or agent can cause or threaten bodily injury, illness, damage to human health, human welfare or property.

## 12  CLAIMS NOTIFICATION CLAUSE

The Assured shall report any loss of or damage to the goods covered under this policy, and any loss or damage which may become a claim under this insurance, promptly to:

Claims in North America please contact

WK Webster (Overseas) Ltd at

ny@wkwebsteroverseas.com

Address:

WK Webster (Overseas) Ltd • 80 Maiden Lane • Suite 302 • New York • NY 10038 • USA

T +1 212 269 8220 • F +1 212 363 9726

www.wkwebster.com

Or the following:

     (a) Their insurance agent and /or broker for prompt transmission to this company or to

     (b) an agent of this company, if there be one at or near the place where the loss occurs or expenses are incurred, or if non in the vicinity to

     (c) a correspondent of the American Institute of the Marine Underwriters

     (d) to a Lloyds agent

     after it becomes known to the Assured.

Every letter, facsimile, telex, notice, writ, summons, process and paper pertaining to a loss or claim shall, immediately upon receipt by the Assured, be forwarded to the party specified above. This duty arises whether or not any claim has been made against the Assured.

It is a condition of the Policy that all losses resulting from theft or where theft may reasonably be suspected shall be reported to the police immediately.


## 13. DEFINITIONS

All words in the Policy in the singular shall include, where the context permits, the plural and vice versa.

All words in the Policy importing the masculine gender only shall include the feminine gender and the words

importing persons shall include individuals, partnerships, corporations and associations.

For the purposes of the Policy:

     1) "Approved Warehouse" shall mean any premises and/or locations utilized by the Assured (and irrespective of whether or not operated by the Assured or by a third party) which complies with the standards specified In Appendix 1 (Warehouse Standards) of the Policy.

     2) "Assured" shall mean the company(ies) specified in the Policy Schedule and/or their subsidiary or associated companies under their direct management control.

     3) "BIMCO" shall mean the Baltic and International Maritime Council.

     4) "Cargo" shall, subject to the operation of the Restricted Cargo Clause in the General Conditions section of the Policy and the and the Excluded Cargo Clause in the Exclusions section of the Policy, mean all lawful goods and/or merchandise and/or transport packaging and equipment such as trailers, containers, pallets, drums, ropes, toggles, chains, nets, tarpaulins or any other similar article of transport packaging or

equipment whilst in the care and/or custody and/or control of the Assured or their sub-contractors or successive sub-contractors.

5) "Carrier" shall mean any person actually performing the carriage of Cargo for reward with their own means of transport ("Performing Carrier"), or any person subject to carrier liability as a result of an express or implied undertaking to assume such liability ("Contracting Carrier").

6) "Customs House Broker" shall mean the performance of services for reward relating to the clearance of import and export consignments by air, road, rail and ocean through customs, including but not limited to the preparation and handling of documents and advisory services in connection therewith.

7) "FIATA" shall mean the Fédération Internationale des Associations de Transitaires et Assimilés (International Federation of Freight Forwarders Associations)

9) "Fine Art" shall mean paintings, etchings, pictures, tapestries and other bona fide works of art, valuable rugs, statuary, marbles, bronzes, rare books, antique silver, manuscripts, porcelains, rare glass and bric-a-brac, collections of books, mixed periodicals, photographs, slides, clippings and other articles of a similar nature including furnishings.

10) "Freight Forwarder" shall mean the performance of services for reward of any kind relating to the carriage, consolidation, storage, handling, packing or distribution of Cargo as well as ancillary and advisory services in connection therewith, including but not limited to fiscal matters, declaring the Cargo for official purposes, procuring insurance upon the Cargo and collecting or procuring payment or documents relating to the Cargo.

11) "Gross Freight Receipts" shall mean the Assured's gross revenue plus payments to agents and sub-contractors in respect of transport or storage services, but excluding customs duty, sales tax, or similar fiscal charge paid on behalf of their customers.

12) "IATA" shall mean the International Air Transport Association.

13) "International Convention" shall mean an international agreement concluded among States in written form and governed by international law.

14) "Insured Services" shall mean the normal business activities undertaken by the Assured when they perform the transportation and/or storage of Cargo for reward, or when they procure the performance of the transportation and/or storage of Cargo for reward, in any of the capacities shown in the Policy Schedule to be insured under the Policy.

15) "Mandatory Law" shall means any statutory law concerning the Insured Services the provisions of which cannot be departed from by contractual stipulations to the detriment of the consignee or consignor or any other person having rights or obligations under the contract terms specified in the Insured Laws & Contracts.

16) "Multimodal Transport Operator" shall mean the performance of services for reward relating to a person who on his own behalf, or through another person acting on his behalf, concludes a multimodal transport contract and who acts as a principal, not as an agent or on behalf of the consignor or of the carriers participating in the multimodal transport operations, and who assumes responsibility for the performance of

the contract.

17) "Non-Approved Warehouse" shall mean any premises and/or location utilised by the Assured (and irrespective of whether or not operated by the Assured or by a third party) which does not comply with the standards specified in Appendix 1 (Warehouse Standards) of the Policy.

18) "Period of Insurance" shall mean the duration of time specified in the Policy Schedule.

19) "Precious Metals" shall mean silver, gold, platinum, palladium, iridium, osmium, rhodium, and ruthenium.

20) "Precious Stones" shall mean diamonds, emeralds, rubies and sapphires.

21) "Premium" shall mean the amount specified in the Policy Schedule which is payable by the Assured to the Insurer at the inception of the Period of Insurance.

22) "Retrospective Inception Date" shall mean the time and date specified in the Policy Schedule, if applicable.

**23)** "Semi-precious Stones" shall mean amethyst, aquamarine, aventurine, carnelian, garnet, lapis lazuli, opal, pearls, rose quartz, topaz and tourmaline.

24) "Third Party Logistics Service Provider" shall mean the performance of services for reward relating to an outsourced logistics service for part of or all of a customer's warehousing, inventory management and transportation and distribution requirements, as well as ancillary and advisory services in connection therewith, utilizing third party companies to perform part or all of the services where required.

25) "Warehouse Keeper" shall mean the performance of services for reward relating to the storage and/or handling of Cargo deposited within a warehouse or other place of storage.

26) "Freight Broker" shall mean an individual or company that serves as a liaison between another individual or company that needs shipping services and an authorized motor carrier. Though a **freight broker** plays an important role in the movement of cargo, the **broker** doesn't function as a shipper or a carrier.

## 14. VALUATION

The goods insured under this policy shall be valued at:

A. If sold, net selling price. Net selling price is defined as selling price less any customary discounts and/or unincurred costs.

B. If not sold, the total amount of the last invoice issued pertaining to the insured shipment (including all charges invoiced therein), plus all charges not included in such invoice, including any prepaid or advanced or guaranteed freight, if any plus 10%.

C. Goods shipped without invoice valued at replacement cost, if replaced. If not replaced, valued at actual cash value.

D. Used goods shall be valued at replacement value with like kind and quality. If unable to be replaced with like kind and quality then at actual cash value.

E. If declared prior to shipment, as declared in writing prior to shipment. Foreign currency to be converted into dollars at bankers' sight rate of exchange applicable to each invoice and/or credit and/or draft.

**15. BROKERS OR AGENTS**

It is understood that for the purposes of this insurance the Insured's Broker of Record is **"As Per Declarations Page".** It is a condition of this policy that the brokers, or any substituted brokers, shall be deemed to be exclusively the agents of the Insured and not of DUAL Commercial in any and all matters related to, connected with, or affecting this insurance. Any notice given or mailed by or on behalf of DUAL Commercial to the above brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to the Insured.

**SECTION 1 - APPLICABLE TO FREIGHT SERVICES LIABILITY**

**16) INSURED LAWS AND CONTRACTS**

a) The National Customs Brokers and Freight Forwarders Association's (NCBFFA) (unamended) and/or the Assured's standard terms and conditions of trading (unamended) as seen and agreed by the Insurer and attached hereto and/or the current FIATA Model Rules For Freight Forwarding Services (unamended)

b) The Assured's bill of lading (unamended) as seen and agreed by the Insurer and attached hereto and/or the current FIATA Bill of Lading (unamended) and/or the current BIMCO Bill of Landing (unamended).

c) The Assured's air waybill (unamended) as seen and agreed by the Insurer and attached hereto and/or the current IATA Air Waybill (unamended).

d) Relevant International Convention or Mandatory Law applicable to the Insured Services.

e) Any other contract declared to and accepted by the Insurer prior to the accident or occurrence giving rise to the loss complained of, which acceptance may be subject to amended Policy terms and conditions, under which the Assured's liability is greater than it is under the relevant Insured Laws & Contracts specified above, and/or under which the Assured undertakes to perform activities and/or accepts responsibilities which they do not normally undertake or accept in the ordinary course of their business ("Bespoke Contract").

6) At law (common law or civil law and/or commercial code or as may otherwise be applicable in country or jurisdiction relevant to the loss complained of) but only if an inadvertent act or omission committed in good faith by the Assured or their employees results directly in the Assured being unable to enforce and/or rely upon (either partially or completely) any defense and/or limitation to their liability and/or any other rights and/or remedies which serve to exonerate and/or limit their liability which are included within the contract terms specified above.

**17. INSURED RISKS**

The Policy shall, subject to the terms conditions warranties limitations exclusions and exceptions of the Policy, cover the Assured's liabilities and/or costs and expenses and/or other risks defined in the clauses below ("Insured Risks") provided that they arise in the ordinary course of the Assured performing Insured Services upon Cargo being transported and/or stored within the Territorial Limits and provided that the contract terms governing the Assured's liability in respect of the loss complained is a law and/or contract specified in the Insured Laws & Contracts section of the Policy Schedule.

**18. LOSS OR DAMAGE TO CARGO CLAUSE**

The Policy shall cover the Assured's liability for actual or alleged physical loss or destruction or deterioration or contamination of or damage to Cargo in transit.

**19. LEGAL COSTS AND EXPENSE CLAUSE**

The Policy shall cover legal costs and expenses necessarily and reasonably incurred by the Assured with the prior agreement of the Insurer (which agreement may be granted retrospectively at the discretion of the Insurer) in defense of a claim made against the Assured which is recoverable under the Policy.

If required in a suit that the Insurer is defending, the Insurer shall pay premiums for appeal bonds to release property that is being used to secure a legal obligation. However, the Insurer shall only pay for bonds valued up to the applicable Limit of Indemnity. The Assured shall, in consultation with the Insurer, apply for and furnish such bonds.

In no case shall the Insurer be liable under this Legal Costs & Expenses Clause for an amount greater than the Legal Costs & Expenses Limit of Indemnity specified in the Policy Schedule

**20. LOSS MITIGATION AND EXPENSE CLAUSE**

The Policy shall cover costs and expenses necessarily and reasonably incurred by the Assured with the prior agreement of the Insurer (which agreement may be granted retrospectively at the discretion of the Insurer), or for which the Assured are liable, with the object of saving, securing, preserving or recovering Cargo in order to prevent or minimize any loss or claim which would be covered under the Policy.

It is a condition precedent to the Insurer's liability under this Loss Mitigation Costs & Expenses Clause that such measures taken by the Assured or the Insurer shall not be considered as a waiver or acceptance of abandonment or otherwise prejudice any rights of either party.

In no case shall the Insurer be liable under this Loss Mitigation Costs & Expenses Clause for an amount greater than the Loss Mitigation Costs & Expenses Limit of Indemnity specified in the Policy Schedule.

**21. LIEN ON CARGO CLAUSE**

The Policy shall cover the loss of any possessory interest the Assured have in, or any lawful lien the Assured have on, Cargo lost destroyed or damaged whilst in transit or in store.

It is a condition of the Policy that the Assured notifies the Insurer and obtains their written agreement prior -to the exercising of such a lien.

**22. DEBRIS REMOVAL CLAUSE**

The Policy shall cover costs and expenses necessarily and reasonably incurred by the Assured with the prior agreement of the Insurer (which agreement may be granted retrospectively at the discretion of the Insurer), or for which the Assured are liable, pertaining to the removal and/or recovery of Cargo and/or the removal and/or

disposal and/or clean up of the debris thereof, consequent always upon a sudden and accidental occurrence covered by the Policy.

It is a condition precedent to the Insurer's liability under this Debris Removal Clause that such measures taken by the Assured or the Insurer shall not be considered as a waiver or acceptance of abandonment or otherwise prejudice any rights of either party.

Nothing herein shall be deemed to amend the Pollution and Contamination Exclusion Clause in the Exclusions section of the Policy which shall be paramount.

In no case shall the Insurer be liable under this Debris Removal Clause for an amount greater than the Debris Removal Costs Limit of Indemnity specified in the Policy Schedule.

## 23. GENERAL AVERAGE AND SALVAGE CLAUSE

The Policy shall cover the Assured's liability for cargo's proportion of general average and/or salvage where the Assured is liable to pay such proportion on cargo's behalf.

In respect of consolidated shipments only, the Insurer shall at the request of the Assured sign and issue general average guarantees or salvage bonds in order to expedite the release of a consolidated shipment.  It is a condition of the Policy that unless the Insurer has given their express prior approval, the Assured shall not release such Cargo until they are in receipt of general average guarantees or salvage bonds from the individual cargo owner or their marine insurers.  This extension shall only apply where the Assured are the consolidation operator.

The liability of the Insurer in respect of amounts recoverable under this General Average and Salvage Clause shall be limited to the amount that the Assured is unable to recover from the consignee or consignor or other cargo interests, or the relevant Limit of Indemnity, whichever the lesser.

## 24. AIR WAYBILL CLAUSE

The Assured shall take reasonable steps to ensure that any air waybill issued by or on behalf of the Assured contains a notice to the effect that; if the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention (1929), or the Warsaw Convention as amended by the Hague Protocol (1955) and/or Montreal Protocol No. 4 (1975), or the Montreal Convention (1999) whichever is compulsorily applicable, will apply and that such conventions govern and in most cases limits the liability of carriers in respect of loss of or damage to cargo.

**25. BESPOKE CONTRACT CLAUSE**

In respect of any Bespoke Contract which the Assured, in good faith, inadvertently omits to declare to the Insurer or which is declared to but not accepted by the Insurer, the Insurer hereby agrees to indemnify the Assured in respect thereof but only to the extent that the Insurer would have been liable under the Policy had the Assured contracted on their relevant standard contract terms specified in Insured Laws & Contracts.

Notwithstanding the foregoing, in such instances Legal Costs and Expenses howsoever incurred shall not be recoverable under the Policy.

**26. BILL OF LADING CLAUSE**

The Assured shall take reasonable steps to ensure that any bill of lading or seafreight waybill or like document issued by or on behalf of the Assured contains a paramount clause incorporating the Hague or Hague Visby Rules or national legislation (Carriage of Goods by Sea act) enacting the rules or the equivalent thereto and any subsequent amendments, and contains a "Deck Cargo" clause stating that non-containerized cargo stated on the face of the bill of lading to be carried on deck are carried on terms exonerating the carrier from liability.

**27. COST AND EXPENSES INCLUSIVE CLAUSE**

Notwithstanding anything expressed or implied in the Policy to the contrary, any and all costs and/or expenses howsoever incurred in the mitigation and/or investigation and/or defense and/or settlement of any claim are subject to and inclusive within the Limits of Indemnity specified in the Policy Schedule.

**28. CROSS LIABILITY CLAUSE**

Where there is more than one named Assured under the Policy, the Policy shall apply separately to each of the Assureds in the same manner and to the same extent as if a separate policy had been issued to each except that such obligation shall not operate to increase the Insurer's limit of liability under the policy as specified in the Limits of Indemnity section of the Policy Schedule.

**29. DUE DILLIGENCE OF THE ASSURED**

It is a condition of the Policy that directors and officers and partners and owners of the Assured shall at all times in the course and conduct of their business take all reasonable precautions and exercise reasonable care, skill, diligence and judgement.

**30. INCORPORATION OF CONTRACT CLAUSE**

It is a condition of the Policy that the Assured takes reasonable steps to ensure that all contract conditions are fully and properly incorporated for example, but without prejudice to the generality of this clause

A) by the printing their contract conditions on the reverse of any invoices and company letterhead, and

B) by ensuring that there is a notice on the front of invoices and the company letterhead confirming that all business is transacted solely in accordance with their contract conditions and drawing any reader's attention to the fact that they are printed on the reverse side, and

C) by ensuring that there is a notice confirming that all business is transacted solely in accordance with their contract conditions, on all fax, stationary and is included in any and all electronic fax or e-mails or any other similar form of communication, and

D) by ensuring that instructions are given to all employees involved in concluding oral contracts, via the telephone for example, so that such contracts are not concluded orally, but are offered subject to fax or e-mail confirmation, and

E) by ensuring that customers are provided with a full copy of their contract conditions by recorded or registered mail.

## 31. INSURED LAWS AND CONTRACTS CONSISTENCY CLAUSE

It is a condition of the Policy that the Assured takes reasonable steps to ensure that they, their employees and their agents

A) do not make any promise, agreement or contract which waive or make void or modify any term or condition of the Insured Laws & Contracts, and

B) do not enter or give instructions to enter information on any transport or storage documentation which is known to be incorrect.

## 32. LAW AND JURISDICTION CLAUSE

It is agreed that this policy, including any endorsement(s), is a contract of marine insurance protecting against marine risks and has been applied for, priced and underwritten as such. This contract of marine insurance and the rights and obligations of DUAL Commercial and the Insured hereunder shall be governed and construed in accordance with federal maritime common law of the United States. In the absence of controlling federal maritime common law of the United States, the law of the state of New York shall apply, irrespective of any principles of choice of law.

Any suit, action or proceeding arising out of or based upon this policy shall be instituted in the United States District Court for the Southern District of New York or the United States District Court in the district in which this policy was issued. Each party to this contract submits to the exclusive jurisdiction of such courts in any suit, action or proceeding and waives any objection to venue of any suit, action or proceeding in the said courts.

## 33. NOT TO INURE CLAUSE

In no case shall the Policy inure to the benefit of any other person or firm or company or corporation or association or concern whatsoever howsoever constituted or of their insurers and, without prejudice to the generality of the foregoing, in no case shall the Policy inure to the benefit of any carriers bailees or sub-

contractors (whether in direct contractual relationship with the Assured or not) or any servants agents or sub-contractors of any of them, or of any insurers of any of them, or of any other party whatsoever.

## 34. NON-CONTRIBUTION CLAUSE

The Policy shall not cover any loss or damage which at the time of the happening of the occurrence giving rise to the loss complained of is covered by or would, but for the existence of the Policy be covered by any other existing insurance policy except in respect of any excess beyond the amount which would have been payable under such other policy had the Policy not been effected.

## 35. RESTRICTED CARGO CLAUSE

Except as provided for below, the Insurer's liability under the Policy in respect of any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the performance of Insured Services upon Restricted Cargo (as specified in the Policy Schedule) shall not exceed the Restricted Cargo Limit of Indemnity specified in the Policy Schedule.

The Restricted Cargo Limit of Indemnity specified in the Policy Schedule shall not apply if, prior to the accident or occurrence giving rise to the loss complained of, the Assured and/or their employees were not aware, or in the ordinary course of their business could not have been aware, that the Cargo in their care and/or custody and/or control was Restricted Cargo. The burden of proof that the Assured and/or their employees were not aware, or in the ordinary course of their business could not have been aware, shall rest with the Assured.

## 36. DECLARED VALUE CLAUSE

Where the Insured Laws & Contracts contain a provision whereby the Assured's liability may be increased by a special declaration of value and/or interest in delivery, privilege is hereby granted to the Assured to accept such declarations up to the amount specified in the Special Declaration of Value or Interest in Delivery Limit of Indemnity specified in the Policy Schedule without prior referral to and the agreement of the Insurer

Such privilege is granted in consideration of payment of an additional premium as listed in the Policy Premiums section of the policy and/or the application of an increased Deductible as specified in the Deductibles section of the Policy.

## 37. SUB-CONTRACTORS CLAUSE

The Policy shall cover Insured Services performed by the Assured in the capacity of a sub-contractor and/or when the Assured elects to sub-contract the performance of Insured Services to a third party.
It is a condition of the Policy that the Assured shall take reasonable steps to ensure that all sub-contractors that

they utilize:

1) are of good repute and financial standing, and

2) have the requisite knowledge, skill and experience to properly perform the services which they have been engaged to perform, and

3) assume under their trading conditions in all respects no lesser liability than the Assured, and

4) are fully insured with an insurance company in respect of any pertinent liability in full.

## 38. VALUE ADDED SERVICES CLAUSE

The Policy shall cover the Assured's liabilities arising out of the performance of logistics and/or value added services by the Assured, for example, but without prejudice to the generality of this clause, stock control, order handling, order picking, order packing, invoicing, bar-coding, assembling and labelling.

Notwithstanding the foregoing, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from faulty or defective workmanship.

## 39. CLAIMS CONDITIONS

The Policy is subject to the operation of all of the following clauses.

## 39.1. APPORTIONMENT OF RECOVERIES CLAUSE

Where the Insurer has borne a loss under the Policy, any recovery from a carrier or other third party in respect of such loss shall accrue to the Insurer up to the amount of such loss (including costs incurred in effecting recovery) and the balance shall be allocated to the Assured or whichever party has borne the loss.

Where a recovery exceeds the amount that has been paid by the Insurer and the amounts borne by the Assured, such excess shall be apportioned equitably between the Insurer and the Assured, taking into account such factors as the amounts borne by each and the dates on which they were borne.

## 39.2. CLAIMS SETTLEMENT CLAUSE

Up to the amount of the applicable Deductible and with respect to each loss, the Assured shall have the privilege of settling any claim covered by the Policy.

Such privilege is granted on the understanding that all such settlements shall be made strictly on a "Without Prejudice" basis.

The Policy shall exclude any claim made against the Assured which is prejudiced by the Assured having failed to have acted in accordance with the above. This exclusion shall only apply to the extent that the Assured's liability is increased by such occurrence.

Notwithstanding the above, all lawsuits must be promptly reported to the Insurer.

### 39.3. GENERAL CLAIMS PROVISIONS CLAUSE

a) The Assured shall exercise the utmost good faith in making any claim against the Policy.

b) The Assured shall take reasonable steps to prevent or minimize any loss or claim which may be recoverable under the Policy.

c) The Assured shall ensure that all rights against carriers an/or bailees and/or sub-contractors and/or other third parties are properly preserved and exercised.

d) Neither the Assured nor any person acting on their behalf shall admit any liability for any loss or claim, or make any promise or offer of payment in respect of any loss or claim, or agree any loss or claim, or incur any costs or expenses in any connection with any loss or claim for which the Assured propose seeking indemnity under the Policy.

e) The Insurer shall be entitled to take over and conduct in the name of the Assured any negotiations or legal proceedings in respect of any claim for which they are, or may be, liable under the Policy.

f) The Insurer shall be entitled to take over and conduct in the name of the Assured the defense or settlement of any claim and/or prosecute for their own benefit any claim and shall have full discretion in the conduct of any proceedings and the settlement of any claim. All costs incurred in respect hereof shall be for the account of the Insurer.

g) The Insurer maintains the right to withdraw their defense of a claim if all covered counts or causes of action are dismissed, stricken and/or withdrawn from any claim, arbitration or litigation.

h) The Insurer maintains the right to withdraw their defense and not pay any amounts after the applicable Limit of Indemnity has been exhausted.

i) In no case shall the Policy cover the remuneration of the Assured or any person appointed by or acting on behalf of the Assured (whether in direct contractual relationship with the Assured or not) or of any other party whatsoever for time and trouble taken to obtain and supply any information and/or documents reasonably required by the Insurer in respect of any loss or claim which may be recoverable under the Policy.

### 39.4. SUBROGATION CLAUSE

The Assured shall, at the request of the Insurer or their agents, assign and subrogate to the Insurer at the time of payment and to the amount not exceeding the sum paid by the Insurer all rights and claims against others and permit suit to be brought in the Assured's name but at the Insurer's expense.

The Assured further agrees to render all reasonable assistance in the prosecution of said suit(s).

### 40. EXCLUSIONS

Notwithstanding anything expressed or implied to the contrary elsewhere in the Policy, and in addition to any other exclusions or exceptions included elsewhere in the Policy, in no case shall the Policy cover the liabilities and/or costs and expenses and/or other events defined in the following clauses.

### 40.1. CONFISCATION EXCLUSION CLAUSE

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from confiscation or requisition or embargo or nationalisation or destruction by any government or public or local authority.

### 40.2. DEFAMATION, LIBEL AND/OR SLANDER EXCLUSION CLAUSE

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any defamation, libel and/or slander.

### 40.3. EXCLUDED CARGO CLAUSE

Except as provided for below, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the performance of Insured Services upon Excluded Cargo (as specified in the Policy Schedule).

If prior to the accident or occurrence giving rise to the loss complained of, the Assured and/or their employees were not aware, or in the ordinary course of their business could not have been aware, that the Cargo in their care and/or custody and/or control was Excluded Cargo, then penalties and/or fines incurred by the Assured as a direct result of the transport and/or storage of such Excluded Cargo shall be considered in terms of the Errors & Omissions Clause in the Insured Risks section of the Policy. The relevant Limits of Indemnity shall apply. The burden of proof that the Assured and/or their employees were not aware, or in the ordinary course of their business could not have been aware, shall rest with the Assured.

### 40.4. FINANCIAL RISKS EXCLUSION CLAUSE

Excepted as provided for below, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any extension of credit or advance of money by the Assured, or any inability of the Assured to pay or collect accounts, or the insolvency or financial default of the Assured or any person with whom they contracted whether directly or indirectly, or any error or defect in any monetary transaction or in accountancy, including Cash On Delivery ("COD") and Cash Against Documents ("CAD") transactions, or the wrongful accounting of customers' funds or funds held in trust on their behalf, or to the extent that any claim loss damage liability or expense is aggravated by the Assured not paying promptly, or at all, any account.

The above exclusion shall not apply to the Assured's liability arising from an inadvertent failure to collect monies

pertaining to a COD or CAD transaction provided that the Assured is liable therefore in terms of an International Convention or Mandatory Law applicable to the Insured Services performed and the loss complained of. Such claims shall be considered in terms of the Errors & Omissions clause in the Insured Risks section of the Policy.

## 40.5. ISM CODE EXCLUSION CLAUSE

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from Cargo being carried by a vessel that is not ISM Code certified or whose owners or operators do not hold an ISM Code Document of Compliance when, at the time of loading of the Cargo on board the vessel, the Assured were aware, or in the ordinary course of business should have been aware:

1) either that such vessel was not certified in accordance in accordance with the ISM Code

or

2) that a current Document of Compliance was not held by her owners or operators

The ISM Code means the International Safety Management Code incorporated into the International Convention for the Safety of Life at Sea 1974 (SOLAS).

## 40.6. INVENTORY SHRINKAGE EXCLUSION CLAUSE

Unless otherwise stated herein, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any inventory shrinkage or unexplained loss or mysterious disappearance of Cargo whilst in store including for example, but without prejudice to the generality of this clause, any unexplained discrepancy between any records made or kept by the Assured and any produced by any customer, or any loss subsisting only in a profit and loss comparison, or shortage discovered upon taking inventory or preparing Cargo for transit which is not traceable to an identifiable event.

## 40.7. LIABILITY TO AUTHORITIES EXCLUSION CLAUSE

Except to the extent provided in the Errors & Omissions Clause in the Insured Risks section of the Policy, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the Assured's liability for duty, taxes, fines or penalties to any customs authority or any other government, port, public, local authority or any other regulatory authority or body whatsoever.

## 40.8. LOSS OF LIFE OR PERSONAL INJURY EXCLUSION CLAUSE

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from death of or bodily injury to or illness or trauma of or any syndrome suffered by a person or living creature.

**40.9. PERFORMANCE GUARANTEE EXCLUSION CLAUSE**

Except in respect of the delay in delivery of Cargo and to the extent provided therefore in the Insured Laws & Contracts, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any contract guarantee, liquidated damages, performance bond or penalty clause, or any deadline whatsoever howsoever incorporated into any agreement or contract into which the Assured entered in.

**40.10. POLLUTION AND CONTAMINATION EXCLUSION CLAUSE**

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any seepage and/or pollution and/or contamination and/or damage to the environment and/or atmosphere and/or watercourse and/or body of water and/or third party, public or private property whatsoever and howsoever arising and/or any threat thereof whatsoever and howsoever arising.

**40.11. PUBLIC POLICY EXCLUSION CLAUSE**

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any event whatsoever in respect of which indemnity from Insurer is contrary to public policy.

**40.12. PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION CLAUSE**

Except to the extent provided under the Errors & Omissions Clause in the Insured Risks section of the Policy, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any punitive, exemplary, penalty or multiple damages awarded against the Assured or any person for whom the Assured may be held liable.

**40.13. RECKLESS AND/OR DISHONEST CONDUCT OF THE ASSURED EXCLUSION CLAUSE**

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the reckless conduct of, or any illegal trade or dishonest or fraudulent or malicious or criminal act or omission of, a director or officer or partner or owner of the Assured.

Notwithstanding the above, the Insurer shall defend the Assured in respect of such claims unless or until a judgement or other final adjudication adverse to the Assured is established and at which time the Assured shall indemnify the Insurer for all costs and expenses incurred by the Insurer in respect of such defense.
The defense of such a claim in the manner described above shall not be considered as a waiver or otherwise prejudice any rights of either party.

**40.14. THIRD PARTY PROPERTY EXCLUSION CLAUSE**

In no case shall the Policy cover any actual or alleged claim loss damage liability or expense to any public, private or third party property of whatsoever description howsoever arising.


**40.15. THIS CLAUSE IS DELIBERATELY LEFT BLANK**


**40.16. WAR, STRIKES AND TERRORISM EXCLUSION CLAUSE**

Unless otherwise stated herein, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from war, civil war, revolution, rebellion, insurrection or civil strife arising therefrom, or any hostile act by or against a belligerent power; confiscation or expropriation; capture, seizure, arrest, restraint or detainment and the consequences thereof or any attempt thereat; any terrorist act or any person acting from a political or ideological motive; strikers, locked-out workmen, or person taking part in labour disturbance, riots or civil commotions; derelict mines, torpedoes, bombs or other derelict weapons of war.


**40.17. WRONGFUL RELEASE OF CARGO EXCLUSION CLAUSE**

Where the Assured is contractually obliged to deliver or release Cargo only upon proof of payment or upon the consignor or the consignor's bank or any other party granting prior written authority for release of Cargo, the Policy shall not, except as provided for below, cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the release of Cargo unless such authority or proof has been obtained.

The above exclusion shall not apply where Cargo is, in good faith, inadvertently released without such authority or proof having been obtained.  In such instances, claims shall be considered in terms of the Errors & Omissions Clause in the Insured Risks section of the Policy.


**40.18. ACTS OF GOD EXCLUSION CLAUSE**

Except to the extent provided under the Shippers Interest coverage in the Insured Services section of the Policy, in no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from Acts of God including, but not limited to Windstorm, Flood, Earthquake, Earthquake Mudslide/Sprinkler Leakage.

**SECTION 2 - APPLICABLE TO SHIPPERS INTEREST**

**41. ACCUMULATION**

Should there be an accumulation of interests beyond the limits expressed in Limits of Liability , Shippers interest section of the policy by reason of any interruption of transit beyond the control of the Assured, or by reason of any casualty, and/or at a transshipping point and/or on a connecting vessel or conveyance, or by reason of one or more vessels loading from or discharging to the same pier, dock or place, this policy shall attach for the full amount at risk, but in no event for more than twice the policy limit, provided that written notice is given to this Company as soon as known to the Assured, and an additional premium paid if required.

**PERILS CLAUSES:**

**42. Perils**

Touching the adventures and perils which this Company is contented to bear, and take upon itself, they are of the seas and inland waters, fires**,** assailing thieves, jettisons, barratry of the Master and Mariners, and all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof except as may be otherwise provided for herein or endorsed hereon.

In respect of shipments by aircraft, the words "seas" and "barratry of the Master and Mariners" shall be read as "air" and "breaches of trust by aircrew' respectively.

**43. Sue And Labor**

In case of any imminent or actual peril, loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns, to sue, labour and travel for, in and about the defense, safeguard and recovery of the goods insured, or any part thereof, without prejudice to this insurance; to the charges whereof, this Company will contribute. Nor shall the acts of the Assured or the Company, in recovering, saving and preserving the goods insured, in case of disaster, be considered a waiver or an acceptance of abandonment.

**44. General Average And Salvage**

General Average and Salvage Charges are payable in full irrespective of insured and contributory values, in accordance with United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or part) if in accordance with contract of affreightment.

Nothing in the preceding paragraph shall be construed to amend the limits of liability set forth in the Limits of liability, shippers Interest of this Policy.

**45. Inchmaree**

This insurance is also specially to cover any loss of or damage to the goods covered hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, officers, crew, engineers or pilots.

**46. Both To Blame**

Where goods are shipped under a Bill of Lading or Contract of Affreightment containing the so-called "Both to Blame Collision Clause", this Company agrees as to all losses covered by this insurance to indemnify the Assured for this policy's proportion of any amount (not exceeding the amount insured under this policy) which the Assured may be legally bound to pay to the shipowner under such clause. In the event that such liability is asserted, the Assured agrees to notify the Company, who shall have the right at their own cost and expense to defend the Assured against such claim.

**47. Released Bill Of Lading (Waiver And/Or Release)**
Privilege is hereby granted the Assured to ship goods covered by this Policy under released or limited Bills of Lading, shipping receipts or other contracts of affreightment without prejudice to this insurance; subject to payment of additional premium, if required.

**48. Bill of lading, etc. (negligence)**

The Assured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the Bill of Lading and/or Charter Party and/or contract of affreightment. The seaworthiness of the vessel and/or craft as between the Assured and this Company is hereby admitted, and this Company agrees that in the event unseaworthiness or a wrongful act or misconduct of ship owner, charter, their agents or servants shall, directly or indirectly, cause loss or damage to the goods covered under this policy, this Company will (subject to the terms of average and other conditions of the policy) pay to an innocent Assured the resulting loss. With leave to sail with or without pilots, to tow and assist vessels or craft in all situations and to be towed.

**49. Refused And/Or Returned Shipments**

Provided reported to this Company promptly, this Policy shall cover, subject to original insuring conditions, goods refused by consignees or which remain at the risk of the Assured beyond the normal course of transit until disposed of by the Assured at additional premium to be agreed. In no event shall this insurance cover after

delivery of the goods to the consignee nor shall it inure to the benefit of the consignee.

**50. Carrier**

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

**AVERAGE CLAUSES:**

**51. Average Terms And Conditions**

    **(a) SHIPMENTS UNDER DECK:**  Except while on deck of the ocean vessel and subject to an On Deck Bill of Lading, shipments suitably packed for export, are insured, against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

    **(b) SHIPMENTS ON DECK:** Shipments suitably packed for export, which are shipped on deck subject to an On Deck Bill of Lading are insured, Warranted free from Particular Average unless caused by the stranding, sinking, burning and/or collision of the vessel: but to pay the insured value of any merchandise and/or goods jettisoned and/or washed overboard, irrespective of percentage.
Notwithstanding the foregoing, merchandise and/or goods shipped on deck subject to an Under Deck bill of lading, without the knowledge and consent of the Assured, shall be treated as under deck cargo and insured as per (a) above.

    Notwithstanding the above, all insured goods shipped in fully enclosed containers which are stowed on deck, are insured subject to the provisions of this policy applying to under deck shipments, provided such goods are subject to an Under Deck or an optional Under Deck/On Deck Bill of Lading.

    **(c) SHIPMENTS BY AIRCRAFT:** Shipments by aircraft, suitably packed for export, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement. Also warranted free of claim for loss or damage due to changes in atmospheric pressure and/or temperature. Whenever the words "ship", "vessel", "seaworthiness", "ship owner", or "vessel owner" appear in this Policy (except in the "Conveyance" clause and the "Limit of Liability" clause), they are deemed to include also the words "aircraft", "air worthiness" or "aircraft owner".

**(d) SHIPMENTS BY BARGE:** Shipments via approved iron and/or steel Barge (other than as a connecting conveyance), suitably packed for export, are insured Warranted free from Particular Average unless caused by the vessel and/or interest insured being stranded sunk, burnt, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard irrespective of percentage, unless broader terms are provided elsewhere within this policy.

**(e) SHIPMENTS BY MAIL:** Shipments by mail or parcel post, suitably packed for export, while in the custody of postal authorities, are insured against All Risks of physical loss or damage from any external cause, irrespective of percentage, but excluding those risks excepted by the Free of Capture and Seizure Warranty and the Strikes, Riots, and Civil Commotions Warranty contained herein, unless such risks are specifically assumed hereunder by endorsement.

## 52. Landing, Warehousing, Forwarding Charges, Packages Totally Lost Loading, Etc.

Notwithstanding any average warranty contained herein, this Company agrees to pay any landing, warehousing, forwarding, other expenses and/or special charges for which this policy in the absence of such warranty would be liable as well as the insured value of any package or packages which may be totally lost in loading, transshipment or discharge and any partial loss arising from transshipment.

This insurance is also to pay landing, warehousing, forwarding and special charges as a result of insolvency or financial default of the owners, charterers, managers or operators of the vessel. In no event, however, shall this insurance cover if, at the time of loading of the subject matter insured on board the vessel, the Assured is aware or, in the ordinary course of business, should be aware that such solvency or financial default could prevent the normal prosecution of the voyage.

## 53. Labels

In case of damage affecting labels, capsules or wrappers, this Company shall not be liable for more than an amount sufficient to pay the cost of new labels, capsules or wrappers, and the cost of reconditioning the goods, but in no event shall this Company be liable for more than the insured value of the damaged goods.

## 54. Trademarked Cartons

This Policy covers damage to trademarked cartons, but claims payable hereunder shall be limited to an amount sufficient to pay the cost of new cartons, including forwarding charges of the new cartons and charges of repackaging.

**55. Brand and Trademark Goods**

In case of damage to goods bearing a Brand or Trademark, the sale of which carries or implies a guarantee of the supplier or Assured, the salvage of such damaged property shall be determined after the removal of all Brands or Trademarks. On containers where the Brand or Trademark cannot be removed, the contents shall be transferred to plain bulk containers. With respect to goods and/or containers from which it is impractical to destroy all evidence of the Assured's connection therewith, this Company agrees to consult with the Assured with respect to the disposition of said goods and/or containers.

**56. Explosion**

Notwithstanding any average warranty to the contrary, this policy to cover loss, damage or expense resulting from explosion, howsoever or wheresoever occurring, irrespective of percentage, excluding those risks excepted by the Paramount Warranties.

**57. Shore Perils**

Notwithstanding any average warranty to the contrary, where this insurance by its terms covers goods while on docks, wharves, quays or elsewhere on shore and/or during land transportation, it shall include the risks of loss, damage or expense caused by fire, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft, collision, derailment and/or any accident to the conveyance, collapse and/or subsidence of docks, wharves, quays and/or structures.

**58. Damage In The Course Of Inspection**

With respect to goods covered hereunder "all risk", this insurance is extended to cover physical damage to the goods caused by the actions of Customs and/or other government agents in the course of their duly constituted governmental inspection duties.

**59. Deliberate Damage / Pollution Hazard**

This Policy covers, but only while the goods insured are on board a waterborne conveyance, loss of or damage to said goods directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under the Policy (subject to all of its terms, conditions and warranties) if the goods insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

This coverage shall not increase the Limits of Liability defined elsewhere in the policy.

**60. Import Duty**

This insurance also covers the risk of loss, by reason of perils insured against, on duties imposed on imported goods and insured hereunder, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, shall attach as an additional insurance upon the goods from the time such duty is paid or becomes due, to the extent of the amounts thereof actually paid or payable.

The Assured will, in all cases, use reasonable efforts to obtain abatement or refund of duties paid or claimed in respect of goods lost, damaged or destroyed.  It is further agreed that the Assured shall, when the Company so elects, surrender the goods to the Customs authorities and recover duties thereon as provided by law, in which event the claim under this policy shall be only for a total loss of the goods so surrendered and expenses which shall include the expense of surrendering the merchandise to the Customs authorities.

**61. F.O.B. / F.A.S. Shipments**

This policy is extended to cover, subject to its terms and conditions, shipments of goods sold for export on F.O.B. or F.A.S. steamer or similar port of loading terms at port of export, from the time the goods leave the warehouse and/or store at the place named in the policy for the commencement of the transit at the risk of the Assured per land conveyances and/or craft and continues during the ordinary course of transit until the goods cease to be at the risk of the Assured but in no event shall this insurance continue beyond the time of delivery on board or alongside ocean steamer or other overseas conveyance as required by the contract sale. The Assured agrees to report on the last day of each month or as soon thereafter as practicable the total value of shipments insured under the foregoing clause and to pay premium thereon at the rates of this Company.

**62. FREIGHT PAYABLE ON DELIVERY  (COLLECT FREIGHT)**

This insurance also covers the risk of loss, by reason of perils insured against, of freight which is payable only upon delivery of the goods insured ("collect freight") hereunder, but warranted free from any claim for General Average or Salvage Charges on freight and free from any claim in respect of freight which has not become due to the Carrier upon arrival of the goods at destination, it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such freight, shall attach as an additional insurance upon the goods from the time such freight is paid or becomes due, to the extent of the amounts thereof actually paid or payable.

The Assured warrants that on all risks insured hereunder a separate amount shall be reported sufficient to cover the collect freight, upon which the rate of premium shall be an agreed percentage of the rate named for the subject goods.

**63. FRAUDULENT BILLS OF LADING**

This policy also covers:

(a) Physical loss of or damage to the goods insured elsewhere under this policy occasioned through the acceptance by the Assured and/or their Agents and/or Shippers of fraudulent Bills of Lading and/or Shipping Receipts and/or Messenger Receipts, and

(b) Physical loss or damage caused by the utilization of legitimate bills of lading and/or other shipping documents without authorization and/or consent of the Assured or their agents.

In no event however does this policy cover loss or damage arising from the shipper's fraud or misstatement.

**64. FUMIGATION**

In the event of a conveyance or location, being fumigated and physical loss of or damage to the Assured's goods results therefrom, this Company agrees to indemnify the Assured for such loss or damage and the Assured agrees to subrogate to this Company any recourse that the Assured may have for recovery of such loss or damage from others.

**65. DEBRIS REMOVAL**

This insurance also covers expenses incurred in removal of all debris of the goods covered hereunder which may be occasioned by loss caused by any of the perils insured against except that this Company shall not be liable under this policy and this Clause for more than the limit " as per declarations page" . Nothing contained herein shall be construed to cover any liability, clean up or other expenses for which the Assured may be liable under any pollution statute. Nothing in the proceeding paragraph shall be construed to amend the limits of liability set forth in this policy.

**66. CONCEALED DAMAGE, DELAYED OPENING**

In the event of delay in the opening of any package after arrival at the final destination, and loss or damage which can reasonably be shown to have occurred prior to delivery to final destination be found when packages are eventually opened, but not later than **30** days after arrival at final destination, such loss shall be adjusted and paid by the Company in the same manner as though the packages had been immediately opened upon arrival, provided such loss or damage is otherwise recoverable under the terms and conditions of the open policy to which this endorsement is attached.

Packages showing external evidence of damage are to be opened immediately or coverage provided herein shall not apply to such packages.

In the event that packages of the above mentioned goods are not to be opened within the above mentioned limit, additional time may be granted, at rates to be agreed, provided notice is given to the Company prior to the expiration of the time limit agreed upon.

## 67. CONTAINER DEMURRAGE CHARGES

This policy shall cover demurrage charges and/or late penalties assessed against, and paid by, the Assured for late return of containers ("container demurrage"), when said containers are retained by the Assured at the instruction of the Company for inspection by the Company's Surveyor in investigation of loss or damage recoverable under this policy.

The time period for which the Company shall be liable for container demurrage charges and/or penalties shall begin at the time the Company instructs the Assured to retain the containers for inspection and end at the time the Company's Surveyor instructs the Assured to return the containers.

## 68. SHORTAGE FROM CONTAINERS

If, by the terms of this policy, coverage is provided for loss due to theft, it is understood to include the unexplained disappearance of packages or other shipping units from containers; whether said containers arrive at final insured destination with original seals intact or not.

It is a condition of this insurance that the Assured shall render all reasonable assistance to the Company in subrogating against the party and/or parties responsible for any loss paid under this clause.

It is a further condition of this insurance that the Assured shall not divulge the existence of the insurance provided by this clause to anyone outside the Assured's organization.  Violation of this condition shall void the insurance provided by this clause with respect to containers, which arrive at final insured destination with original seals intact.

## 69. CONTINGENT INTEREST /GUARANTEE OF COLLECTIBILITY

In consideration of an additional premium as agreed, this policy is extended to cover shipments made by the Assured on terms whereby the Assured is not obligated to furnish transit insurance or, on shipments purchased by the Assured on C.I.F. or similar terms whereby transit insurance is arranged by the seller and/or others, this Company will guarantee to the Assured the prompt collection of all losses which otherwise would have come within the terms of this policy.  An advance shall be made as a loan without interest and shall be repayable to the extent of any recovery received by the Assured from insurance effected by others.  Such shipments shall be valued as provided for elsewhere herein.

It is a further condition of this insurance that the Assured shall not divulge the existence of the insurance provided by this clause to anyone outside the Assured's organization. Violation of this condition shall void the insurance provided by this clause.

## 70. DIFFERENCE IN CONDITIONS

With respect to shipments purchased by the Assured on C.I.F. or similar terms, whereby ocean marine insurance is arranged by the seller and/or others, this policy, in consideration of an additional premium as agreed, is extended to cover the Difference in Conditions between those provided by this policy and those provided in the insurance furnished by the seller and/or others.

All shipments covered hereunder shall be valued at the amount of the seller's insurance.

It is a further condition of this insurance that the Assured shall not divulge the existence of the insurance provided by this clause to anyone outside the Assured's organization. Violation of this condition shall void the insurance provided by this clause.

## 71. INCREASED VALUES AND/OR PROFITS

As agreed, this insurance shall also cover Increased Values and/or Profits on shipments purchased by the Assured on C.I.F. or similar terms whereby ocean marine insurance is arranged by the seller and/or others, such Increased Values and/or Profits being valued at the difference between the amount of insurance furnished by the seller and/or others as evidenced by certificates or policies of insurance and the valuation provided in this Policy for merchandise which otherwise would have been insured hereunder.

This insurance to pay the same percentage of loss as the insurance furnished by the seller and/or others would pay subject to the conditions of coverage in this policy. This insurance to be free of claim for General Average and/or Salvage and/or Special Charges except on excess Contributory Value over the original amount insured and only if uncollectible under the original insurance. This insurance to be without benefit of salvage unless the terms of the original insurance permit participation. Full interest admitted. Policy proof of interest.

## 72. PAIR AND SETS CLAUSE

If goods which form part of a complete unit are physically lost or damaged within the coverage of this Policy, then this Company agrees to pay the difference between (a) the insured value of the complete unit and (b) salvage value of the remaining unit. If, in the consequence of any direct physical loss or damage, a full lot or range of sizes or colors is broken, then this Company agrees to pay the difference between (a) the insured value of the full lot or range or (b) the salvage value of the full lot or range. This Company may at its option, require

the Assured to surrender the remaining property or parts thereof damaged or undamaged, upon payment of any loss in full.

## 73. DURATION CLAUSES:

### 73.1. Warehouse To Warehouse

This insurance attaches from the time the goods leave the warehouse and/or store at the place named in the policy for the commencement of the transit, and continues during the ordinary course of the transit, including customary transshipment if any, until the goods are discharged overside from the overseas vessel at the final port.  Thereafter, the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of the fifteen (15) days (or thirty (30) days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur.  The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed.  Held covered, at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured.

This insurance attaches from the time the goods leave the warehouse at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the original destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided below in Clause C. This insurance specially covers the goods during,
In the event of the exercise of any liberty granted to the ship owner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, the insurance continues until the goods are sold and delivered at such port or

It is necessary for the Assured to give prompt notice to this Company when they become aware of an event for which they are "held covered" under this policy. The right to such cover is dependent on compliance with this obligation.

### 73.2. Application Of Warehouse To Warehouse Coverage

Regardless of the terms of purchase and/or terms of sale and provided the Assured is obligated to provide insurance during the waterborne shipment, this insurance covers from Warehouse to Warehouse in accordance with the Clauses contained herein.

In the event a claim arises under this clause, the Assured shall use all reasonable means to first recover the

full amount of such loss from the importer/exporter in accordance with the terms of purchase/sale prior to calling on this insurance for payment. Should a claim be paid under this clause, the Assured shall subrogate to this Company all rights of recovery from the importer/exporter, importer/exporter's insurance or other responsible party.

### 73.3. Craft, etc.

This insurance includes the risks of transit by craft, raft and/or lighter to and from the vessel. Each craft, raft and/or lighter is to be deemed separately insured. Also, this insurance is to cover any special supplementary lighterage to take the goods to or from the warehouse. The Assured is not to be prejudiced by any agreement exempting lightermen from liability.

### 73.4. Deviation

This insurance shall not be vitiated by an unintentional error in description of a vessel, voyage or interest, or by deviation, overcarriage, change of voyage, transshipment or any other interruption in the ordinary course of transit from causes beyond the control of the Assured. It is agreed however, that any such error, deviation or other occurrence mentioned above shall be reported to this Company as soon as known to the Assured and additional premium paid if required.

### 74. Marine Extension Clauses (April 1943)

Notwithstanding anything to the contrary contained in or endorsed on this policy, it is agreed that, in consideration of premium as agreed, the following terms and conditions, which supersede and override the Warehouse to Warehouse and the Deviation Clause wherever they are inconsistent with them, shall apply to all shipments which become at risk under this policy.

A. This insurance attaches from the time the goods leave the warehouse at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the original destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided below in Clause C.

B. This insurance covers the goods during
   (I) deviation, delay, forced discharge, reshipment and transshipment,
   (II) any other variation of the adventure arising from the exercise of a liberty granted to the ship owner or charterer under the contract of affreightment.
   (II) any other variation of the adventure arising from the exercise of a liberty granted to the ship owner or charterer under the contract of affreightment.

C   In the event of the exercise of any liberty granted to the ship owner or charterer under the contract  of affreightment whereby such contract is terminated at a port or place other than the original insured destination, the insurance continues until the goods are sold and delivered at such port or place; or, if the goods be not sold but are forwarded to the original insured destination or to any other destination, this insurance continues until the goods have arrived at the final warehouse as provided in Clause A.

D.  If while this insurance is still in force and before the expiry of fifteen (15) days from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge is completed, the goods are resold (not being a sale within the terms of Clause C.) and are to be forwarded to a destination other than that covered by this insurance, the goods are covered hereunder while deposited at such port of discharge until again in transit or until the expiry of the aforementioned fifteen (15) days, whichever shall first occur.  If a sale is effected after the expiry of the aforementioned fifteen (15) days while this insurance is still in force, the protection afforded hereunder shall cease as from the time of the sale.

E. Held covered, at a premium to be arranged, in case of change of voyage or of any omission or error in the description of the interest, vessel or voyage.

F. This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

G. It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond control of the Assured.

H. It is necessary for the Assured to give prompt notice to this Company when they become aware of an event for which they are "held covered" under this policy. The right to such cover is dependent on compliance with this obligation.

All other terms and conditions of the policy, not in conflict with the foregoing, remain unchanged, it being particularly understood and agreed that the Paramount Warranties remain in full force and effect and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities, strikes riots, civil commotions, delay, inherent vice, infidelity, nuclear or chemical incidents.

## 75. Consolidation/Repacking
Notwithstanding anything contained elsewhere herein to the contrary (particularly the Warehouse to

Warehouse and Marine Extension Clauses), and subject to the limit of liability herein, this insurance is extended to cover the goods insured hereunder whenever same are stopped in transit, anywhere in the world, short of final destination, for the purpose of consolidation, deconsolidation, packing, repackaging, containerization, de-containerization, or otherwise subject to the insuring conditions, applicable to the shipment, set forth in the Average Terms and Conditions Clause for a period not exceeding **30** days after arrival at the premises of the Assured, consolidators, truckers, warehousemen or others.  Held covered in excess of the above time limit at an additional premium if required.

## 76. MECHANICAL GOODS CLAUSES

### 76.1. Machinery

When the goods covered hereunder include a machine consisting when complete for sale or use of several parts, then, in case of loss or damage covered by this insurance to any part of such machine, this Company shall be liable only for the value of the part lost or damaged, or at the Assured's option, for the cost and expense, including labor and forwarding charges, of replacing or repairing the lost or damaged part; but in no event shall this Company be liable for more than the insured value of the complete machine.

### 76.2. Used And/Or Reconditioned Machinery (Secondhand Replacement)

With respect to shipments of used and/or reconditioned machinery, notwithstanding the Machinery Clause above, this Company shall not be liable for a greater portion of the cost of repairing or replacing, including labour and forwarding charges, of the part or parts lost or damaged than the insured value of such machinery bears to the value of a new machine of like kind and quality.

## 77. OTHER INSURANCE

A. If an interest insured hereunder is covered by other insurance which attached prior to the coverage provided by this policy, then DUAL Commercial shall be liable only for the amount in excess of such prior insurance.

B. If an interest insured hereunder is covered by other insurance which attached subsequent to the coverage provided by this policy, then DUAL Commercial shall nevertheless pay to the full extent of liability under this insurance without right to claim contribution from said subsequent insurance.

C. If an interest insured hereunder is covered by other insurance which is attaching on the same date as the coverage provided by this policy, insurance shall be deemed simultaneous and DUAL Commercial shall be liable only for the prorata contribution to the loss or damage as the amount insured hereunder bears to the aggregate of such simultaneous insurance.

D. If DUAL Commercial is relieved of liability by this clause, DUAL Commercial will either:

(i) return premium charged hereunder equivalent to the cost of the other insurance at the agreed policy rate of DUAL Commercial or

(II) retain the premium and insure against any difference in conditions which may make other insurance less favorable than coverage which would have been provided by DUAL Commercial. In no event will DUAL Commercial be liable for larger amount insured by the application of this clause than it would be liable for if there was no other insurance.

In no event shall the amount insured exceed the agreed limits of this policy.

## 78. STORAGE COVERAGE

**This coverage applies where there is a limit shown for scheduled and/or unscheduled locations on the Declarations Page attached to this policy.**

This policy is extended to cover raw materials, work in progress and finished goods of the Insured or similar property of others for which the Insured is liable while in storage locations worldwide.

LOCATION DEFINITION: Any building, tank, dock, wharf, pier, bulkhead or groups thereof bounded on all sides by public streets or open waterways or open land space, each of which shall be not less than fifty feet wide (for the purposes of this definition, any bridge or tunnel crossing such street or waterway or open space shall render such separation inoperative unless equipped with fire wall and/or doors or other approved methods whereby the buildings, etc. on either side are currently designated as separate fire areas by qualified fire surveyors).

Unless otherwise provided herein, goods covered hereunder are insured in accordance with Clause 7A Average Terms, except as follows:

In addition to the exclusions set forth elsewhere in this policy, this clause does not insure loss, damage or expense caused by, contributed to, or resulting from:

A. unexplained loss, mysterious disappearance of inventory shortage, or where there is no direct physical evidence of what happened, except at bailee locations;

B. water damage to property stored in the open;

C. loss or damage due to any process or while actually being worked upon and resulting therefrom.

Goods insured hereunder to be valued in accordance with Clause 8, Valuation contained in this policy, plus the actual amount of import duty paid or payable.

DUAL Commercial shall not be liable for more than the limit of liability as described below in any one loss, disaster or casualty.

**Schedule of Approved Locations and Limit of Liability**

Location                                             Limit of Liability*

**"As Per Declarations Page"**                                      **"As Per Declarations Page"**

*except that DUAL Commercial's limit of liability with respect to loss or damage caused by:

A. flood, surface water, waves, tidal water or the overflow of a body of water is $**"As Per Declarations Page"** per occurrence and per annum;

B. windstorm, defined as high winds or wind driven rain is $**"As Per Declarations Page"** per occurrence and per annum;

C. earthquake is $**"As Per Declarations Page"** per occurrence and per annum. Earthquake defined as a shaking or trembling of the earth's crust, caused by underground volcanic or tectonic forces or by breaking or shifting of rock beneath the surface of the ground from natural causes. An earthquake is further defined to include all related shocks or aftershocks. A single deductible and limit will apply within any 72 hour period.

All claims for loss, damage or expense resulting from any one occurrence or series of occurrences arising out of one event, shall be adjusted as one claim, and from such claim there shall be deducted the sum of $**"As Per Declarations Page"** or equivalent in any other currency. Each claim for or damage from earthquake shall be subject to a deductible of $**"As Per Declarations Page"** at each location.

If the total value at risk at any one location exceeds the applicable limit of liability, DUAL Commercial shall in no event be liable for more than the full amount of loss up to but not exceeding the applicable limit of liability.

Permission is hereby granted the Insured to purchase specific insurance in excess of the limits of liability provided herein.

In the event of cancellation of this policy, this storage coverage shall automatically terminate as of the effective date of said cancellation, notwithstanding any in this policy which may provide that cancellation shall not affect any pending risk.

**SECTION 4 - APPLICABLE TO ERRORS AND OMISSIONS**

## 79. ERRORS AND OMISSIONS

The Policy shall cover the Assured's liability for claims made against them by the consignor and/or consignee and/or a customs and excise authority for actual or alleged breach of professional duty by reason of a negligent act or error or omission arising from

A)   the accidental failure of the Assured or their employees to comply with or provide instructions

B)   faulty arrangements accidentally made by the Assured or their employees

C)   clerical errors accidentally made by the Assured or their employees

D)   the accidental provision of incorrect advice or information by the Assured or their employees.


In respect of claims made against the Assured by a customs and excise authority, cover is limited to claims (which shall include punitive fines unless indemnity is contrary to public policy) arising out of customs processing or any import or export declaration, clearance, quota, refund, or any tax or excise or duty or suspension procedure, or any community/common transit system.


In no case shall the Insurer be liable under this Errors & Omissions Clause for an amount greater than the Errors & Omissions Limit of Indemnity specified in the Policy Schedule

**SECTION 4 - APPLICABLE TO THIRD PARTY LIABILITY**

**80. THIRD PARTY LIABILITIES**

Subject to the limit of liability and the terms and conditions of this policy, we will pay all sums which *you* become legally liable to pay resulting from an *occurrence* happening during the *period of insurance* and arising out of the *insured service(s) "as per declaration page"* for:

We indemnify you for your liability arising from the following:

   1) Non contractual liabilities at law

         A)  Accidental loss/damage of third party property;

         B)  Accidental bodily injury to or disease incurred by any person death, injury or illness of any third party

         C) consequential loss resulting from (a) and (b) above

         D) Pollution clean up and removal

   2) Legally enforceable contractual liabilities under a contract or contracts, that have been previously advised to and approved by us in writing in respect of:

         (a) renting or leasing *equipment*;

         (b) using the services of a sub-contractor or joint service partner;

         (c) any other contract entered into in connection with the *insured service(s)*;

         (d) *consequential loss* resulting from (a), (b) or (c) above.

In no case shall the Insurer be liable under this Third Party Liability Clause for an amount greater than the Third Party Limit of Indemnity specified in the Policy Schedule

**81. THIRD PARTY LIABILITY EXCLUSIONS**

Excluding *your* liability in consequence of:

1)t he existence, maintenance or use of:

         (a) any licensed truck, licensed automobile or other licensed mechanically propelled vehicle

         (b) any unlicensed truck, unlicensed automobile or other unlicensed mechanically propelled vehicle used outside *your* premises.

2) death, illness or personal injury or any claim arising directly or indirectly under Worker's Compensation or Employer's Liability Acts or any other statutory or common law liability in respect of death personal injury or illness of any worker or other person employed by *you* in any capacity whatsoever when the death or personal injury or illness arises out of or in course of the employment of the worker or other person.

3) loss of or damage to:

      (a) property held in trust or in custody by *you* or *your* employees but not employee's property;

      (b) *your* property or property loaned, hired or rented by *you*.

4) an *occurrence* in the USA or Canada on public roads involving a *container,* trailer or chassis that is owned or leased by *you*.

**SECTION 5 - APPLICABLE TO TRANSPORTATION BROKERS LIABILITY**

**82. TRANSPORTATION BROKER LIABILITY**

A) This policy insures you for liabilities arising from your service as a transportation broker where such service includes the arrangement for the transportation of cargo on a public road in the USA or Canada by a motor carrier which you hire.

B) You will also use your best efforts to ensure that the hired motor carrier has a valid automobile liability policy at the time of hire.

C) The insurance provided by this Coverage Form will not act as a substitute for any compulsory "auto" insurance. We do not insure the hired motor carrier for any limit either in addition to, or in excess of, its automobile liability insurance.

D) Any failure of either the motor carrier or its automobile liability insurer to respond in the event of an accident will not affect your insurance as outlined at 1 above.

E) We may agree to add your customer as an additional insured to your policy to fulfill contractual obligations with our approval.  However, said customer is only insured to the extent of your negligence, and, not for their own negligence.

**F)** The insurance provided by this Coverage Form will not act as a substitute for any compulsory "auto" insurance.  Failure of the "insured" to comply with compulsory insurance requirements shall not invalidate this insurance, but in the event of such failure, we will only be liable to the same extent as if the "insured" had complied with such requirements.


In no case shall the Insurer be liable under this Transportation Broker Liability Clause for an amount greater than the Transportation Broker Liability Limit of Indemnity specified in the Policy Schedule



# BLANKET ADDITIONAL INSURED WITH WAIVER OF SUBROGATION

1. **2. INSURED** of the Logistics Operator policy forming part of this policy is amended to include as an additional insured any person or organization whom the Assured is required to add as an additional insured under a written contract or agreement, provided that the contract or agreement must be:

    a. In effect during the time of this policy; and

    b. Executed prior to any claim for loss or damage under the contract or agreement requiring the additional insured status.

    but only with respect to liability caused, in whole or in part, by:
    1) your acts or omissions; or
    2) the acts or omissions of those acting on your behalf;
    in the performance of your ongoing & completed operations for the Additional Insured(s) at the location(s) designated in the Geographic Limits on the declarations page.
    However:
    1) the insurance afforded to such additional insured only applies to the extent permitted by law; and
    2) If coverage provided to the Additional Insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

2. With respect to the insurance afforded to these Additional Insureds, the following is added to SECTION "5. POLICY LIMITS":

If coverage provided to the Additional Insured is required by a contract or agreement, the most we will pay on behalf of the Additional Insured is the amount of insurance:

    1) required by the contract or agreement; or

    2) available under the applicable Limits of Insurance shown in the Declarations;

    whichever is less

1. Insurers waive their rights of subrogation against anyone to whom the Assured is obligated by written contract or agreement to provide a waiver of subrogation.

2. Coverage under this Policy is primary and any insurance maintained by an additional insured is excess and non-contributing to this insurance, only as respects liability arising out of work performed by the Named Assured for the additional insured. This provision does not apply in the event the additional insured is a motor carrier, freight broker, or any other logistics operator with whom the Assured has contracted for the transportation of property.



**Endorsement number:  1**                          **Policy # LDCH000006-00**

**Insured: J.B. Hunt Transport, Inc.**                **Effective date:  December 31, 2023**

The above mentioned Policy is amended to reflect the following additional terms and conditions on the Policy:

Clause 80. Third Party Liabilities is amended as follows:

Subject to the limit of liability and the terms and conditions of this policy, we will pay all sums which you become legally liable to pay resulting from an occurrence happening during the period of insurance and arising out of the insured service(s) for:

We indemnify you for your liability arising from the following:

      1) Non contractual liabilities at law:
           A) Accidental loss/damage of third party property;
           B) Accidental bodily injury to or disease incurred by any person death, injury or
              illness of any third party
           C) consequential loss resulting from (a) and (b) above
           D) Pollution clean up and removal

      2) Legally enforceable contractual liabilities under a contract or contracts in respect of:
           (a) renting or leasing equipment;
           (b) using the services of a sub-contractor or joint service partner;
           (c) any other contract entered into in connection with the insured service(s);
           (d) consequential loss resulting from (a), (b) or (c) above.

In no case shall the Insurer be liable under this Third Party Liability Clause for an amount greater than the Third Party Limit of Indemnity specified in the Policy Schedule.

# EXHIBIT B

**From:** Eric McConnell <Eric.Mcconnell@jbhunt.com>
**Sent:** Tuesday, December 20, 2022 9:29 AM
**To:** Easterling, Michelle (MMA) <Michelle.Easterling@MarshMMA.com>; Andrew Haley <andrew.haley@jbhunt.com>
**Cc:** Wilson, Jonathan (MMA) <Jonathan.Wilson@MarshMMA.com>; Lloyd, Theron (MMA) <Theron.Lloyd@MarshMMA.com>
**Subject:** RE: Truck Broker LIability - Binding authorization needed

Bind it.



**Eric McConnell**
VP Risk Management
479.419.3630(O) 479.459.3630(M)
www.jbhunt.com

   

Intermodal | Dedicated | Final Mile | Flatbed | Truckload | Refrigerated | LTL | Managed Logistics

---

**From:** Easterling, Michelle <Michelle.Easterling@mcgriff.com>
**Sent:** Tuesday, December 20, 2022 9:27 AM
**To:** Eric McConnell <eric.mcconnell@jbhunt.com>; Andrew Haley <andrew.haley@jbhunt.com>
**Cc:** Wilson, Jonathan <Jonathan.Wilson@mcgriff.com>; Lloyd, Theron <Theron.Lloyd@mcgriff.com>; Easterling, Michelle <Michelle.Easterling@mcgriff.com>
**Subject:** Truck Broker LIability - Binding authorization needed

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Eric,
Can you confirm we have authorization to bind truck broker liability coverage at the premiums listed below:

Primary
- $7M limit less $2M Deductible
- ▮▮▮▮ Annual Premium + SLT ▮▮
- Additional ▮▮▮▮ in premium due if total incurred loss ratio exceeds 60% within the 12 months post policy expiration (60% loss ratio defined as $597K in claims paid and incurred)
- Maximum total policy premium ▮▮▮▮

Excess
- $3M x $7M
- ▮▮▮▮ Annual Premium + SLT ▮▮

| Line of Coverage | Term | Pol # | Carrier | Carrier Rating | Expiring<br><br>Total Annualized | Expiring Rates<br><br>vs. Renewal Exposures | Renewal<br><br>Renewal Premium Incl SLT | Premium Variance $<br><br>Expiring Premium vs Renewal Premium | Premium & Exposure Variance %<br><br>Expiring Rates vs Renewal Rates |
|---|---|---|---|---|---|---|---|---|---|
| TBL | | | | | | | | | |
| TBL 5x2 | 12/31/22-23 | TBD | 25% Chaucer Insurance Company DAC, 25% Lloyd's Synd Chaucer 1084, 50% Houston Casualty Co | A XV;<br>A XV;<br>A++XV | | | ██████ | | |
| TBL 3x7 | 12/31/22-23 | TBD | Lloyds | A XV | | | ██████ | | |
| Total TBL | | | | | | | | | |

Thanks,
Michelle



**Michelle Easterling, CPA, CIC, CRM, CPCU**
*Senior Client Account Executive*
*Risk Management Division*
C: 479-966-6577| E: Michelle.Easterling@McGriff.com
1465 E Joyce Blvd, Suite 205, Fayetteville, AR 72703 | McGriff.com
McGriff CA License #0C64544

Please note: We are moving to a new location and will be in place by 1/16/2023.  At that time our address will be 2828 N. Mansfield Ave, Suite 202, Fayetteville, AR 72703

*Please be advised insurance coverage cannot be altered, bound or cancelled by voicemail, email, fax, or online via our website and insurance coverage is not effective until confirmed in writing by a licensed agent. The information in this transmission may contain proprietary and non-public information of McGriff Insurance Services, Truist, or their affiliates and may be subject to protection under the law. The message is intended for the sole use of the individual or entity to which it is addressed. If you are not the intended recipient, you are notified that any use, distribution or copying of the message is strictly prohibited. If you received this message in error, please delete the material from your system without reading the content and notify the sender immediately of the inadvertent transmission.*

*Any information, analyses, opinions and/or recommendations contained herein relating to the impact or the potential impact of coronavirus/COVID-19 on insurance coverage or any insurance policy is not a legal opinion, warranty or guarantee, and should not be relied upon as such. As insurance agents, we do not have the authority to render legal advice or to make coverage decisions, and you should submit all claims to your insurance carrier for evaluation as they will make the final determination. Given the on-going and constantly changing situation with respect to the coronavirus/COVID-19 pandemic, this communication does not necessarily reflect the latest information regarding recently-enacted, pending or proposed legislation or guidance that could override, alter or otherwise affect existing insurance coverage. At your discretion, please consult with an attorney at your own expense for specific advice in this regard.*

This email contains confidential material for the sole use of the intended recipient(s). Any review, use, distribution, or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

# EXHIBIT C

K. Thomas Slack, Esq. (AZ State Bar #013412)
tslack@bmsslaw.com
BEALE, MICHEAELS, SLACK & SHUGHART, PC
7012 N 18th Street
Phoenix, Arizona 85020-5502
Phone: 602-285-1444
Fax: 602-285-1516
Attorneys for Plaintiff

Craig R. McClellan, Esq. (CA State Bar #71865) – *Pro Hac Vice* Pending
craig@mcclellanlaw.com
Conor J. Hulbert, Esq. (CA State Bar #254697) – *Pro Hac Vice* Pending
conor@mcclellanlaw.com
THE McCLELLAN LAW FIRM
1144 State Street
San Diego, California 92101
Phone: 619-231-0505
Fax: 619-544-0540
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C.C., by and through her Guardian ad Litem, Crystal Gee; P.C., by and through her Guardian ad Litem, Crystal Gee; B.C., by and through his Guardian ad Litem, Crystal Gee; Vanya Watson, individually as surviving natural parent of Lindsey Watson, deceased, and as statutory plaintiff for and on behalf of all surviving beneficiaries of Lindsey Watson; Pamela Bass, individually as surviving natural parent of Gregory Cox, deceased, and as statutory plaintiff for and on behalf of all surviving beneficiaries of Gregory Cox, <br><br> Plaintiffs, <br><br> v. | CV-24-08064-PCT-SMM <br><br> **COMPLAINT FOR NEGLIGENCE** <br><br> **DEMAND FOR JURY TRIAL** |

JB Hunt Transport, Inc.; Borderlanders, Inc.;  )
and Shokhijakhon Bekmuradov,                    )
                                                )
                    Defendants.                 )
_____

Plaintiffs allege:

**<u>PARTIES</u>**

1.      Plaintiff Vanya Watson is an individual residing in Coconino County, Arizona, and is the natural mother of Lindsey Watson. Pursuant to A.R.S. §12-612, Plaintiff Vanya Watson brings this action both on her own behalf as well as for and on behalf of all surviving statutory beneficiaries of Lindsey Watson, who include the decedent's minor children C.C., P.C., and B.C.

2.      Plaintiff Pamela Bass is an individual residing in Maricopa County, Arizona, and is the natural mother of Gregory Cox. Pursuant to A.R.S. §12-612, Plaintiff Pamela Bass brings this action both on her own behalf as well as for and on behalf of all surviving statutory beneficiaries of Gregory Cox, who include the decedent's minor children C.C., P.C., and B.C.

3.      Plaintiff C.C. is a minor residing in Coconino County and represented through her Guardian, Crystal Gee, and is the natural child of Gregory Cox and Lindsey Watson.

4.      Plaintiff P.C. is a minor residing in Coconino County and represented through her Guardian, Crystal Gee, and is the natural child of Gregory Cox and Lindsey Watson.

5.      Plaintiff B.C. is a minor residing in Coconino County and represented

through his Guardian, Crystal Gee, and is the natural child of Gregory Cox and Lindsey Watson.

6.     Defendant JB Hunt Transport, Inc. is a corporation in good standing and doing business in Arizona as a general freight carrier. Its principal place of business is located at J.B. Hunt Corporate Drive, Lowell, Arkansas. J.B. Hunt has three offices/locations in Phoenix.

7.     Defendant Borderlanders, Inc. is a corporation in good standing and doing business in Arizona as a general freight carrier. Its principal place of business is located at 322 North Shore Drive, Suite 200, Pittsburgh, Pennsylvania.

8.     Defendant Shokhijakhon Bekmuradov is an individual residing in Queens County, New York.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction based upon diversity of citizenship.

10.     Venue is proper in that at least one defendant corporate entity resides in this district.

## FACTUAL ALLEGATIONS

### J.B. Hunt's Business

11.     JB Hunt Transport Services Inc. (dba JB Hunt) is one of the largest trucking companies in the United States.

12.     JB Hunt has over 24,000 trucks, 26,900 drivers, and 150,000 trailers. In 2022, its trucks logged over 1.6 billion miles.

13.     JB Hunt is based in Arkansas, but it transports freight across North

America.

14.     JB Hunt holds an interstate motor carrier license with operating authority from the US Department of Transportation (DOT) and the Federal Motor Carrier Safety Administration (FMCSA).

15.     According to JB Hunt, it is one of the largest surface transportation and delivery companies in North America.[1]

16.     JB Hunt provides customized freight movement and delivery services tailored to meet individual customers' requirements and typically involve long-term contracts. These arrangements are generally referred to as dedicated services and may include multiple pickups, drops, and freight handling.[2]

17.     JB Hunt uses both (1) company-owned and (2) outsourced trucks and drivers to deliver its transportation services. JB Hunt refers to its outsourced trucks and drivers as "outsourced carriers," "contracted power units," "independent contractors," and "third-party carriers":

- "Our service offerings include transportation of full-truckload containerized freight, which we directly transport utilizing our company-controlled revenue equipment and company drivers, independent contractors, or third-party carriers."[3]

- "We utilize a combination of company-owned and contracted power units to

---

[1] (JB Hunt, 2022 Annual Report, Business Overview, p. 103.)
[2] (JB Hunt, 2022 Annual Report, Business Overview, p. 103.)
[3] (JB Hunt, 2022 Annual Report, Business Overview, p. 103.)

provide traditional over-the-road full truckload delivery services."[4]

- "We also utilize independent contractors and third-party carriers to complete our services."

- "JB Hunt operates over 21,000 trucks [now up to 24,000] and over 151,000 pieces of trailing equipment. By leveraging company-owned assets in addition to a pool of qualified third-party carriers, we give our customers unmatched access to capacity."[5]

18.     "Through this expansive array of company-owned assets and access to additional capacity through a pool of qualified third-party carriers, J.B. Hunt offers mode-agnostic, customizable solutions to meet modern transportation needs. With our scale and fleet density, we are equipped to deliver."[6]

19.     JB Hunt uses both company-owned and outsourced trucks and drivers to deliver its transportation services to as large a customer base as possible. By outsourcing trucks and drivers as needed, JB Hunt avoids the expense of owning more trucks and employing more drivers and is able to deliver trucking services that exceed its internal capacity.

**JB Hunt's Outsource Carrier Agreement**

20.     JB Hunt uses an arrangement it calls an "Outsource Carrier Agreement" with its "JB Hunt Outsource Carriers." The outsource contract requires outsourced

---

[4] (JB Hunt, 2022 Annual Report, Business Overview, p. 103.)
[5] https://www.jbhunt.com/blog/company/capacity-to-deliver
[6] https://owneroperators.jbhunt.com/business-units/highway-services

carriers to obtain liability and workers compensation insurance with a JB Hunt approved insurer with JB Hunt named as a certificate holder. JB Hunt pays the outsourced carrier directly and the outsourced carrier agrees not to compete with JB Hunt. The contract requires that the outsourced carrier report to JB Hunt its arrival for loading and unloading, confirmation of the completion of loading and unloading, accessorial charges, reweigh charges, overage, periodic check calls, and accident reporting within 2 hours of the occurrence.

21.     JB Hunt's outsourced carrier contract periodically refers to its outsourced carriers as "independent contractors." JB Hunt, however, controls every aspect of the transaction and maintains responsibility to the customer for the care, transport, and delivery of the shipped property.

**Borderlanders Inc.**

22.     JB Hunt has an Outsource Carrier Agreement with Borderlanders Inc., a trucking company based in Pennsylvania. When JB Hunt's company-owned trucks or drivers are not available, JB Hunt uses Borderlanders' trucks and drivers to transport property for JB Hunt's customers.

**The Subject Shipment**

23.     In October 2023, JB Hunt agreed to transport 1,900 pounds of medical equipment from Denver Colorado to Phoenix Arizona. The Bill of Lading for the shipment lists "JB Hunt Load Number 2TG5912," and provides that the freight charges be billed to "JB Hunt Transport Inc."

24.     Rather than use its own truck and driver to transport its customer's

property, JB Hunt utilized Borderlanders, its JB Hunt Outsource Carrier, to pick up, transport, and deliver the property. Borderlanders, in turn, sent its 26-year-old truck driver Shokhijakhon Bekmuradov to handle the transport.

**The Collision**

25.     On October 10, 2023, Mr. Bekmuradov was working as a JB Hunt Outsource Carrier driving a 70-feet-long tractor trailer filled with 1,900 pounds of medical equipment from Denver to Phoenix.

26.     Around 8:30 pm, Mr. Bekmuradov was driving west on U.S. Route 160 in Arizona. US Route 160 is a rural two-lane highway with a posted speed limit of 65 miles per hour.

27.     At 8:38 pm, Mr. Bekmuradov attempted to pass a recreational truck and trailer by moving into the lane of oncoming traffic. As Mr. Bekmuradov started to overtake the truck and trailer, he ignored the end of the passing zone and a large "No Passing Zone" sign. Mr. Bekmuradov continued in the oncoming lane of traffic in excess of 65 miles per hour as a family of five came around a bend ahead in the opposite direction.

28.     Mr. Bekmuradov's tractor trailer collided head-on into the oncoming vehicle driven by Gregory Cox. Gregory (44 years old) was driving with his long-standing companion, Lindsey Watson (39 years old), in the front passenger seat. Their three children, C.C. (7 years old), P.C. (5 years old), and B.C. (19 months old) were in the back seat. The collision decimated their vehicle. Gregory and Lindsey were horrifically killed. C.C. and P.C. suffered life-threatening injuries. B.C. was also

1   injured.

2       29.     Mr. Bekmuradov's attempt to pass the truck and trailer in the no passing

3   zone, and the ensuing head-on collision, were recorded on Mr. Bekmuradov's dash

4

5   camera. The dash camera video shows that Mr. Bekmuradov was not paying attention

6   to the road and that his negligence was extreme and outrageous.

7
## AS A CAUSE OF ACTION AGAINST
8
## ALL DEFENDANTS FOR NEGLIGENCE FOR WRONGFUL DEATH
9
## AND PERSONAL INJURIES, PLAINTIFFS ALLEGE:

10      30.     Plaintiffs incorporate paragraphs 1 through 29 as though fully set forth

11  herein.

12
13      31.     Mr. Bekmuradov was negligent in attempting to pass the truck and trailer

14  in the no passing zone in the lane of oncoming traffic while approaching a blind curve

15  at high speed in the dark.

16
17      32.     Mr. Bekmuradov was not paying attention to the roadway in the moments

18  leading up to the collision. He appeared from the dash camera video to be distracted by

19  something in the truck, most likely his phone. He ignored the "No Passing Zone" sign

20  and the double no-passing lines on the highway without any apparent recognition. He

21
22  did not react to Mr. Cox's oncoming vehicle until it was far too late.

23      33.     Mr. Bekmuradov was negligent per se in his violation of multiple

24  Arizona transportation statutes, including but not limited to ARS 28-725 (Limitations

25
26  on overtaking on the left), ARS 28-726 (Limitations on driving to left of roadway

27  center), and ARS 28-727 (No passing zone).

28      34.     Mr. Bekmuradov's extreme negligence, recklessness, and violation of

multiple statutes all caused the collision that resulted in the wrongful deaths of the children of Vanya Watson and Pamela Bass and minor Plaintiffs' parents, Gregory Cox and Lindsey Watson, and the catastrophic injuries to the minor Plaintiffs C.C., P.C., and B.C.

35.     JB Hunt, as the motor carrier accepting responsibility for the transportation of the medical equipment from the customer, is vicariously liable under federal statutes and regulations governing interstate shipping for the negligence of its statutory employee Mr. Bekmuradov.

36.     The Federal Motor Carrier Safety Act defines a motor carrier's "employee" to include a "driver of a commercial motor vehicle including an independent contractor while in the course of operating a commercial motor vehicle." (49 C.F.R. § 390.5.) By eliminating the common law employee/independent contractor distinction, the definition serves to discourage motor carriers from using the independent contractor relationship to avoid liability exposure at the expense of the public.

37.     Unlike a mere broker, JB Hunt accepted, arranged for, and legally bound itself to the transport of the subject shipment, which it was authorized to ship as a licensed interstate motor carrier. JB Hunt cannot insulate itself from liability for negligence occurring in the conduct of its business by making an arrangement with so-called independent contractors such as Borderlanders to transport freight for it. JB Hunt's duty to safely operate its transportation services on public highways was nondelegable.

38.     JB Hunt is also liable for its negligent hiring, supervision, entrustment, and retention of Borderlanders. JB Hunt knew or should have known that Borderlanders had a history of hiring inexperienced and incompetent drivers that put the motoring public at risk of catastrophic injury or death.

39.     Borderlanders is vicariously liable for the negligence of its employee Mr. Bekmuradov.

40.     Borderlanders is also liable for its negligent hiring, supervision, entrustment, and retention of Mr. Bekmuradov. Borderlanders knew or should have known that Mr. Bekmuradov was an inexperienced and incompetent driver that put the motoring public at risk of catastrophic injury or death.

41.     As a result of the Defendants' conduct, Plaintiffs and the surviving statutory beneficiaries for the deaths of Lindsey Watson and Gregory Cox, have all suffered, and will continue to suffer into the future, pain, mental anguish, grief, emotional distress, anxiety, sorrow and loss of enjoyment of life, over the deaths of Gregory Cox and Lindsey Watson. They have also suffered and will continue to suffer the loss of their love and affection, care, comfort, guidance, and companionship. In addition, Plaintiffs C.C., P.C., and B.C. have suffered and will continue to suffer the loss of income and services previously provided by the deceased. Plaintiffs Vanya Watson and Pam Bass have incurred funeral, burial, and memorial expenses.

42.     As a result of the Defendants' conduct, C.C., P.C., and B.C. have suffered and will continue to suffer pain, discomfort, suffering, disability, disfigurement, anxiety, and loss of enjoyment of life because of their physical injuries.

They have also suffered and will continue to suffer expenses for medical care, treatment, and services.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

Dated:   April 2, 2024

BEALE, MICHEAELS, SLACK & SHUGHART, PC


By:   */s/ K. Thomas Slack*
K. Thomas Slack, Esq.
7012 N. 18th Street
Phoenix, Arizona 85020
Attorneys for Plaintiffs

# EXHIBIT D

| | | | |
|---|---|---|---|
| **Carrier ID:** | 1821417 | | |
| **Carrier Name:** | Borderlanders Inc | **Agreement Date:** | 11/14/2019 2:20:23 PM (Pacific Time) |
| **Address:** | 148 Oakville Dr Apt 1B | **MC Number:** | MC1019332 |
| **City, State & Zip:** | Pittsburgh, PA 152204420 | **US DOT Number:** | 3243700 |
| **Contact:** | Frank Akron | **Phone:** | 412-721-5835 |

## OUTSOURCE CARRIAGE AGREEMENT

This Outsource Carriage Agreement (hereinafter referred to as "OCA") is made and entered into between J.B. Hunt Transport, Inc., whose principal office is located at 615 J.B. Hunt Corporation Drive, Lowell, AR 72745, (hereinafter known as "JBHT") and Borderlanders Inc, whose principal office is located at 148 Oakville Dr Apt 1B Pittsburgh, PA 152204420 (hereinafter known as "CARRIER") (hereinafter collectively known as the "Parties").

## RECITALS

WHEREAS, JBHT is a carrier duly authorized to transport or to arrange for the transportation of freight; and, WHEREAS, JBHT has received approval from certain of its customers (hereinafter "Customer" or "Customers") to tender freight to various transportation service providers for outsourced services; and, WHEREAS, CARRIER is duly authorized by appropriate federal, state or provincial agency or agencies of either the United States or Canada, or both, to provide transportation services (proof of such authority or authorities shall be provided to JBHT by CARRIER); and, WHEREAS, CARRIER wishes to supply its services to JBHT for outsourced services; NOW, THEREFORE, JBHT and CARRIER hereby agree to the following terms:

1. **OCA and Other Documents.**

   1.1 **Applicability of 49 USC §14101 and Priority of Documents.** This OCA is entered into in accordance with 49 USC §14101. Except as may be otherwise provided herein or in any addenda hereto, this OCA, and the services provided hereunder, shall be subject to Titles 49 of the United States Code ("USC") and of the Code of Federal Regulations ("CFR"). Pursuant to 49 USC §14101(b)(1), however, JBHT and CARRIER hereby waive any and all rights and remedies provided under that part to the extent they are in conflict with the terms of this OCA and its addenda. Unless expressly stated otherwise in this OCA or its addenda, this OCA and any addenda shall govern the relationship between JBHT and CARRIER and all other documents shall be subordinate to them. In the event of a conflict between this OCA and an addendum or amendment the term of the addendum or amendment shall apply. This OCA and any attachments, exhibits, amendments or addenda hereto shall be the entire agreement between the parties and supersedes and cancels any and all prior written or oral agreements and understandings regarding the subject matter of this OCA between the Parties. No modifications or amendments to this OCA shall be binding upon JBHT unless initialed and signed by a JBHT authorized representative. This OCA may not be assigned by CARRIER in whole or in part without the prior written agreement of JBHT.

   1.2 **Contract Carriage/Standard Bill of Lading Terms.** Except as otherwise provided in this OCA and any addenda hereto, whether or not CARRIER is authorized to operate, or does operate, as a common carrier, each and every shipment tendered to CARRIER by JBHT during the term of this OCA shall be deemed to be a tender to CARRIER as a motor contract carrier. All shipments shall be deemed to have been made on the Uniform Straight Bill of Lading despite the bill of lading form that is supplied for any individual shipment.

   1.3 **Load Tender Form.** JBHT shall submit load tenders (hereinafter "Tender" or "Tenders") to CARRIER on the behalf of Customers. The transportation services provided by CARRIER shall be designed to meet the distinct transit, service and pricing requirements of JBHT and Customers, as set out in each Tender. The origins and destinations to be served, the commodities to be transported, and the rates and charges applicable to the transportation services shall be included in the Tender. Acceptance of the Tender and its terms shall be made by signature and return by CARRIER or by actual acceptance of the tendered shipment. All Tenders shall be deemed binding attachments to this OCA and shall be controlled hereby. Driving directions to or from a customer's location may be communicated to the CARRIER via the load tender document or other specified means. Directions are for informational purposes only. It shall be the CARRIER()'s sole responsibility to insure the directions are appropriate and JBHT makes no guarantee with respect to specified routes and the compatibility of those routes with regards to any type of equipment.

2. **Relationship of the Parties.**

   2.1 **CARRIER Status.** CARRIER shall perform any and all services hereunder as an independent contractor. No provision of this OCA or any act or omission of either party shall be construed for any purpose to express or imply a joint venture, partnership, principal/ agent, fiduciary, parent/subsidiary, employer/employee relationship or other such relationship implying a lack of independent operation by CARRIER. CARRIER shall provide sole supervision and liability for and shall have exclusive control over the operations of its personnel, contractors, subcontractors, and other agents, as well as any and all other vehicles, equipment and property, whether tangible or intangible, under the control of CARRIER. JBHT shall have no right to discipline or direct the performance of any personnel, contractors, subcontractors, and other agent of CARRIER. CARRIER agrees and warrants that it shall at no time and for no purpose represent any affiliation with JBHT other than that of an independent contractor and shall not, other than in that capacity, set itself out as having any power or authority to act on the behalf of or to bind JBHT. CARRIER shall at no time knowingly or willfully take any action that in any way reflects negatively on JBHT.

   2.2 **CARRIER Personnel.** CARRIER assumes full responsibility and liability for the payment of the following listed items and agrees to comply with the laws, and any rules and regulations promulgated thereunder, by any applicable federal, state, provincial or local jurisdiction (and, when applicable, shall provide periodic proof of such compliance): payroll taxes or contributions to taxes for unemployment insurance, old age pensions, worker's compensation, social security, or other related protection with respect to persons engaged in the performance of said transportation services. JBHT shall not be responsible for any act or omission of any personnel, contractors, subcontractors or other agents of CARRIER. CARRIER shall fully indemnify and hold JBHT harmless under the terms of indemnity, herein, for any claim brought against JBHT for any such employment obligation.

3. **Non-exclusivity.**

   3.1 **OCA not Exclusive.** Unless otherwise agreed through a written amendment hereto, CARRIER and JBHT agree that this OCA is nonexclusive and that JBHT may utilize other Carriers to fulfill the transportation needs of the customers of JBHT. In addition, CARRIER shall be free to accept freight from customers other than JBHT. CARRIER is further notified, understands and agrees that all loads tendered are on an "as needed" basis and nothing contained herein, nor any tendered are on an "as needed" basis and nothing contained herein, nor any guarantee any volume of any kind or constitute any commitment whatsoever to utilize the services of CARRIER.

4. **CARRIER Service Requirements.**

   4.1 **Communications with JBHT** CARRIER shall be responsible to give periodic updates on the status of any shipment for which it accepts tender. Such

communication shall be to advise JBHT of information such as, but not limited to: CARRIER's arrival for loading and unloading at each stop; confirmation of completion of loading and unloading at each stop; any overage, shortage or damage information relating to cargo; notice of the location where any trailer is spotted, if JBHT or customer equipment is used; periodic check calls, and accident reporting. The method(s) CARRIER uses to provide such information to JBHT shall be approved by JBHT and may include: EDI, ELT, DraynetTM (a proprietary program designed by JBHT), facsimile, Internet, e-mail, telephone, or other agreed means. CARRIER acknowledges receipt of and agrees to follow the J.B. Hunt Cargo Claims and Accident Reporting procedures attached hereto as Attachment A.

4.2 **Covenant Not to Back Solicit.**

    4.2.1 **No Back-Solicitation.** Except where mutual customers exist, CARRIER hereby agrees that neither it nor its independent contractors, subcontractors, owner operators or agents will, while this OCA is effective and for a period of one (1) year following termination of this OCA, directly or indirectly solicit or accept traffic from customers, shippers, or consignees initially introduced to it by JBHT or from customer-specific shipping origins and destination point-to-point lane combinations that were first tendered to CARRIER by JBHT (hereinafter "JBHT Traffic"). The term "mutual customers" includes any customers with whom CARRIER has provided transportation services within 6 months prior to CARRIER's execution of this OCA and who also do business with JBHT.

    4.2.2 **Penalty for Breach.** If CARRIER, its independent contractors, subcontractors, owner operators or agents at any time while this OCA is effective or within one (1) year following termination of this OCA, directly or indirectly solicits or accepts JBHT Traffic as defined herein, JBHT shall be entitled to a commission of thirty-five (35%) of the linehaul revenue received by CARRIER on such JBHT Traffic.

4.3 **Prohibition Against Brokering.** Except as may be otherwise provided in this OCA or any addenda hereto, **CARRIER hereby agrees and acknowledges that it is strictly prohibited from using other motor carriers, or brokers, or "substituted services" for the services to be performed hereunder for JBHT and Customers.** Trip leasing shall not be allowed hereunder. Should CARRIER violate any of the prohibitions contained in this section, CARRIER agrees that it shall be fully liable for any payment due to such motor carriers or brokers or for substituted services. CARRIER further agrees that it shall be fully liable for any loss, damage or delay to the Commodities of JBHT's Customer(s), and any and all liabilities, losses, claims, costs, damages, and injuries (including death) incurred in transit to the same extent that CARRIER would be liable if it performed the transportation directly. Should CARRIER use other motor carriers / "substituted services" or broker out any movement tendered by JBHT, such action shall constitute a breach of this OCA. Each incident of such breach shall subject the CARRIER to immediate termination of this OCA, subject to the sole discretion of JBHT. Such penalty shall not be a limitation of remedies available to JBHT for any such breach.

4.4 **Hazardous Materials.** JBHT may tender hazardous material shipments to CARRIER if CARRIER meets all requirements established in Attachment B to this OCA. CARRIER hereby acknowledges receipt of and agrees to be bound by the Extra Requirements for Hazardous Materials Shipments attached hereto as Attachment B. CARRIER shall be responsible to inspect all paperwork tendered by a shipper to insure its accuracy and the commodity being shipped. In the event JBHT tenders a load to CARRIER that is not designated as containing hazardous materials and upon arrival at a shipper's location the CARRIER is informed or discovers that that shipper intends to load hazardous materials, or similar other commodities for which special permits or authority is required and for which CARRIER has not been approved to transport for JBHT, then CARRIER shall be responsible to notify JBHT and to reject any such shipment. In the event CARRIER fails to reject a shipment containing hazardous material then CARRIER shall indemnify and hold JBHT harmless form all fines, penalties, claims, cleanup, environmental harm or any other associated costs that arise as a result of transporting such load. If CARRIER properly notifies JBHT of the discovery of a hazardous material shipment and can provide a current Hazardous Materials Certificate of Registration issued by the US DOT and, at its expense, insurance as required in 49 CFR 387.9 and CARRIER wishes to transport the hazardous material shipment, then CARRIER and JBHT may negotiate for such services on a load-by-load basis.

4.5 **Security Requirements.** JBHT is a participant in the Customs-Trade Partnership Against Terrorism ("C-TPAT", with U.S. Customs) and Partners in Protection ("PIP" with Canadian Customs). As such JBHT expects CARRIER to comply in order for JBHT to remain compliant with such programs.

4.6 **Equipment.**

    4.6.1 CARRIER shall ensure that the transportation services shall be performed with equipment which is in good order, condition and repair and which meets with all applicable federal and state laws, rules and regulations, including but not limited to those of the DOT.

    4.6.2 CARRIER acknowledges that JBHT deals in commodities requiring sanitary equipment that is in compliance with local, state and federal statutes and regulations. CARRIER agrees that it will provide only equipment which is in compliance with such statutes and regulations, and specifically agrees that no equipment will be supplied for transportation of shipments hereunder which has ever been utilized to haul garbage, industrial, municipal or residential refuse, solid or liquid hazardous waste or any similar materials.

4.7 **Receipts and Bills of Lading.** Each shipment hereunder shall be evidenced by a receipt, which shall be signed by an agent or employee of CARRIER and showing the kind and quantity of product received by CARRIER at origin, the name of CARRIER's employee and naming CARRIER as the carrier of the shipment. Such receipt shall be presumptive evidence of CARRIER's receipt of such shipment in good order and condition unless the contents of such shipment are not readily observable or as may otherwise be noted on the face of such receipt. If the CARRIER, JBHT or Customer elects to use a bill of lading, manifest or other documents, any terms, conditions and provisions of such bill of lading, manifest or other documents shall not operate as an amendment to this OCA, but shall be subject and subordinate to the terms, conditions and provisions of this OCA and, in the event they conflict with this OCA, the terms, conditions and provisions of this OCA shall prevail and take precedence.

4.8 **Representations and Warranties Regarding Drivers and Equipment.** CARRIER represents and warrants that its drivers and equipment will meet the following requirements:"

    a. Drivers will be qualified by CARRIER in accordance with 49 CFR 391, 392 and 380 (as applicable);

    b. Drivers will have completed controlled substance and/or alcohol testing as required by 49 CFR 382;

    c. Drivers will have no more than 3 moving violations in the past 3 years (from conviction date);

    d. Drivers will have no DWI or DUI convictions in the past 5 years or a current charge pending (from conviction date);

    e. Drivers will have no careless or reckless driving violations in the past 5 years (from conviction date);

    f. Drivers will have a valid CDL of the proper class with necessary endorsements;

    g. Drivers will be properly rested and in compliance with 49 CFR 395;

    h. CARRIER acknowledges that is satisfies its duty to monitor driver hours of service compliance in accordance with FMCSR;

    i. Equipment provided by CARRIER will meet the requirements of 49 CFR 393 and 396;

    j. Equipment will be inspected by the driver and determined to be free of defects likely to result in an accident or mechanical breakdown;

    k. CARRIER possesses all necessary authority, permits and other documents required for movement of the freight tendered.

4.9 **US/CANADA or US/MEXICO BORDER CROSSINGS.** The CARRIER in possession of a load when it crosses an international border is solely

responsible for ensuring that they have proper paperwork and clearances to move the load across a border. Any penalties or fines imposed by Customs for failure to do this correctly are the responsibility of the CARRIER, and not JBHT.

5. **CARRIER Qualification**

5.1 **Authority.** As stated in the Recitals, CARRIER shall provide proof that it is duly authorized to perform the specified services it is to provide to JBHT. CARRIER shall not transport any tendered shipment and shall notify JBHT immediately in the event all or any part of such required authority is cancelled. If CARRIER performs any services for which it does not or no longer possesses proper authority, then it shall forfeit the right to payment for such services and shall hold JBHT and Customers harmless under the terms of Indemnification herein.

5.2 **Safety Rating.** CARRIER shall provide JBHT with a copy of the most recent safety rating for CARRIER. If CARRIER is operating domiciled in California then carrier shall also provide a copy of the most recent BIT inspection for CARRIER. Unless otherwise approved, the safety rating for CARRIER must be Satisfactory. CARRIER shall immediately notify JBHT if CARRIER's safety rating becomes Conditional or Unsatisfactory. In the event of a Conditional or Unsatisfactory rating, JBHT may suspend all tender of all shipments until such rating is again acceptable and JBHT may exercise the right to immediate termination of the OCA

5.3 **Insurance.**

5.3.1 **Procurement.** CARRIER shall procure and maintain, at no cost to JBHT, and with reputable and financially responsible insurance underwriters with an AM best rating of "B+" or better, the following insurance coverages:

5.3.1.1 Cargo liability insurance, whether All-Risk or Broad Form, covering risks for loss of or damage to shipments, in the minimum amount not less than One Hundred Thousand Dollars ($100,000) per shipment;

5.3.1.2 Automobile liability insurance for bodily injury (including injury resulting in death) and loss of or damage to property, in the amount not less than One Million Dollars ($1,000,000) combined single limit per occurrence, and extending to "Any Auto" or "All Owned, Hired and Non-Owned Autos." "Scheduled Autos" is acceptable providing the specific vehicle to be utilized is named on the carrier's insurance schedule.

5.3.1.3 Workers' compensation insurance as required by applicable law (AM Best rating of "B" or better is acceptable for workers' compensation coverage);

5.3.1.4 Any additional insurance requirements under any and all applicable United States, Canada and Mexico federal, state, provincial and local laws, regulations and rules.

5.3.2 **Certification.** CARRIER shall furnish to JBHT written certificates showing that the above insurance has been procured and is being maintained, the amount of any deductibles, self-insured retentions or the like applying to each policy, and specifying the name of the insurer, insurance underwriter, producer or issuing agency, the policy number or numbers, and the expiration date or dates. JBHT shall be a certificate holder on the policies described above and, as to each policy, in the event of cancellation or material modifications of any policy, written notice shall be given to JBHT at least thirty (30) days prior to the effective date of such cancellation or modification. Should CARRIER's insurance be cancelled at any time for any reason whatsoever then CARRIER must notify JBHT immediately and CARRIER shall not accept any further shipments.

5.3.3 **Applies to Independent Contractors.** Insurance provided by CARRIER hereunder shall also completely and unconditionally apply and extend to and cover losses or liabilities occasioned by any and all independent contractors, subcontractors, or owner operators of any tier utilized by CARRIER to transport freight tendered by JBHT. Certificates of insurance provided to JBHT shall specify such application to and coverage of such sub-/independent contractors and owner operators.

5.3.4 **Exclusions and Restrictions.** The coverage provided under the cargo policy and other policies required herein shall have no exclusions or restrictions of any type that would forseeably preclude coverage relating to loss and damage claims, including reasonable cargo claims. CARRIER hereby agrees to provide directly to JBHT and grants permission to and requires its insurance producers and insurers to provide directly to JBHT upon JBHT's request a copy of all insurance policies of every coverage type, including a copy of all exclusions from the cargo policy. CARRIER's cargo insurance policies shall be primary and not contingent and shall not exclude coverage for infidelity, fraud, dishonesty, or criminal acts of CARRIER or of the personnel (including officers and directors), contractors, subcontractors, owner operators or other agents of CARRIER. If said policy contains such exclusions, CARRIER shall obtain and furnish a policy extension or surety bond providing such coverage to the satisfaction of JBHT.

5.3.5 **Premiums and Deductibles.** CARRIER shall be responsible for all premiums and deductibles, and not withstanding any provision of the paragraph, it is understood and agreed that the liability assumed by CARRIER hereunder shall not be limited to the insurance coverage stipulated herein. No policy shall have a deductible, retention, self-insured retention or the like in excess of $10,000.

5.3.6 **Failure to Comply with Requirements.** Breach. CARRIER agrees that breach of the provisions of this Article 5 constitutes a material breach of this OCA whereupon JBHT may, upon notice, immediately terminate this OCA.

6. **Payment**

6.1 **Payment Terms.** CARRIER shall make a best effort to invoice JBHT within fourteen (14) days of a shipment's delivery. JBHT shall pay CARRIER for its services pursuant to the terms in the Tender, or as otherwise agreed in writing, and upon receipt by JBHT from CARRIER of (1) the original bill of lading or shipping order, (2) delivery receipt (such bills of lading, shipping orders and delivery receipts shall be referred to as "Shipment Documents" (3) a copy of the Tender and (4) CARRIER's invoice. CARRIER shall write the JBHT load number on each such document for purposes of identification and cross-referencing. Failure by CARRIER to provide any Shipment Documents may, within the sole discretion of and to the satisfaction of JBHT, be grounds for withholding or delaying payment for services related to the subject shipment. JBHT shall have no responsibility to pay any invoice received more than one hundred eighty (180) days from the date of a shipment's delivery. The parties agree that any monies owed by JBHT to CARRIER may be withheld or offset by any claims or other amounts that CARRIER may owe to JBHT, including, but not limited to for any overpayments or payments made in error by JBHT. In addition, in the event that CARRIER ceases on-going operations, has its liability or cargo insurance coverages cancelled or revoked, otherwise breaches this OCA, is insolvent, files a petition in bankruptcy, or if a trustee is appointed to liquidate the assets of CARRIER, the parties agree that any monies owed by JBHT may be withheld and offset by any claims or other amounts that may be owed by CARIER to JBHT.

6.2 **Responsibility for Payment.** CARRIER agrees that it shall look solely to JBHT for payment for any services rendered hereunder, and shall not, in any event whatsoever, contact the Customer, Shipper, Consignor or Consignee regarding payment of freight bills without the prior, express written consent of JBHT. In the event CARRIER or any of its independent contractors, subcontractors, owner operators or other agents violates this provision, then CARRIER shall be subject to a penalty of $500 per occurrence.

7. **No Lien.** CARRIER shall have no lien and CARRIER hereby expressly waives its right to any lien on any cargo or other property of JBHT or its Customers. As such, CARRIER shall not withhold any freight due to a dispute with JBHT regarding any freight charges.

8. **Cargo Liability and Claims.**

    8.1 **Liability.** CARRIER shall be liable to JBHT, and its Customers, as set forth in Title 49 United States Code §14706 (the Carmack Amendment) and applicable common law, for any and all loss of the shipment due to loss of or damage (injury) to cargo transported pursuant to this OCA, occurring while in the care, custody or control of CARRIER irrespective of where the loss, damage or delay occurs (in interstate, foreign, intrastate, domestic or trans-border commerce originating at a point in and/or destined to a point in the United States, Canada, or Mexico). Any attempt by CARRIER to limit their liability or amend this OCA by provisions contained in any bill of lading, delivery receipt or tariff (whether filed, published or independently determined), whether purported to be incorporated by reference into this OCA by an attachment or otherwise shall be deemed null and void.

    8.2 **Claims** JBHT shall act as the third party administrator for any claim brought by Customers. CARRIER hereby acknowledges receipt of and agrees to follow the J.B. Hunt Cargo Claims and Accident Reporting Procedures attached hereto as Attachment A. In the event that the receiver refuses to accept a load for delivery or any portion of a load, CARRIER agrees to cooperate with the JBHT in investigating and resolving the delivery of the load at issue, including, but not limited to, waiting at the receiver or other designated location until an adjuster arrives to inspect the load, the receiver is persuaded to accept the load, and/or the shipper provides other directions regarding the disposition of the load. CARRIER agrees to comply with any reasonable requests of JBHT, the shipper or receiver regarding the disposition of the load, including delivery of the load to another specified location. If CARRIER fails to cooperate, CARRIER shall be liable to JBHT for any additional costs or expenses incurred by JBHT in the investigation and resolution of the load at issue, including, but not limited to costs and expenses associated with employing the services of another carrier to complete delivery and disposition of the load, CARRIER agrees that JBHT shall be entitle to withhold and offset any such amounts against any amounts owed by JBHT to CARRIER. Except as specifically set forth to the contrary herein, all claims for overage, shortage, loss and damage and any salvage arising therefrom shall be submitted to CARRIER and handled and processed in accordance with 49 CFR Part 370. CARRIER shall acknowledge receipt of all such claims within thirty (30) days, and shall settle all claims within (120) days of receipt.

    8.3 **Salvage.** In the event branded or labeled goods are damaged, JBHT (in conjunction with Customer) may determine, in its sole discretion, whether the goods may be salvaged and, if salvageable, the value of such salvage. CARRIER shall not sell, otherwise dispose of, or permit the sale, disposal or salvage of any goods bearing any trade name, trademark, logo or service mark without first, obtaining the written consent of JBHT and then removing all such trade names, trademarks, logos or service marks prior to such sale or disposal.

    8.4 **Time Limits.** Except as otherwise set out in this Article 8, the time limits for filing of loss and damage claims, and time limits for filing any action at law for disallowance of claims, shall be governed by the provisions contained in 49 U.S.C. Sections 14705 & 14706.

9. **Undercharge and Overcharge Claims.** Except as otherwise expressly provided for herein, all claims for overcharge, undercharge and duplicate payment shall be processed as provided in 49 C.F.R. Part 378. The time for filing of initial claims for alleged undercharges, overcharges or duplicate payments under the terms of this OCA shall be one hundred and eighty (180) days from the date of receipt of the original invoice containing such disputed charges. Failure to file a claim challenging initial charges within said one hundred and eighty (180) day period shall forever bar any action at law for recovery of the same. Any action at law by either party to collect alleged undercharges or overcharges under the terms of this OCA shall be commenced not later than eighteen (18) months after delivery of the shipment. Expiration of said eighteen (18) month term shall be a complete and absolute defense against any such claim, regardless or any extenuating or mitigating circumstances or excuses of any nature whatsoever.

10. **Indemnity**

    10.1 **Terms.** CARRIER shall defend, indemnify and hold JBHT and its Customers ("Indemnitee(s)") harmless from all fines, costs, penalties, liabilities and claims of every kind, including attorneys' fees, costs of suit, settlements, judgments, and all other expenses to which JBHT or its Customers may be subjected on account of bodily injury to persons (including injury resulting in death) and loss of or damage to any property whatsoever (including cargo), violation of Law, or any other claim arising out of or in connection with the transportation of property under this OCA by CARRIER or the personnel, contractors, subcontractors or any other agent of CARRIER. CARRIER's obligation to defend, indemnify and hold JBHT and its Customers harmless under this provision shall not in any manner be subject to any limitation on the amount or types of damages, compensation or benefits payable by CARRIER or the contractors, subcontractors or other agents of CARRIER under applicable worker's compensation acts, disability 10 Version 5 / 07/02/2012 / ICS-Standard-Web Version 10 benefit acts or other employee benefit acts, and CARRIER hereby specifically waives, and shall cause its independent contractors, subcontractors, and owner operators to waive any immunity any of them may have under such acts. JBHT shall defend, indemnify and hold harmless from all fines, costs, penalties, liabilities and claims of every kind including attorney's fees, costs of suit, settlements, judgments, and all other expenses to which CARRIER may be subjected on account of bodily injury to persons (including injury resulting in death) and loss of or damage to any property whatsoever (including cargo), violation of law, or any other claim caused by the sole gross negligence or intentional wrongful acts or omissions of JBHT.

    10.2 **Notice of Claims.** JBHT shall give CARRIER notice of any claim or suit coming within the purview of the foregoing indemnity. CARRIER will assume the defense of any claim, demand or action against an Indemnitee and will, upon the request of the Indemnitee, allow the Indemnitee to participate in the defense thereof, such participation to be at the expense of the Indemnitee. Termination of this OCA shall not affect the continuing obligations of CARRIER hereunder with respect to those acts, breaches, failures or omissions falling within the purview of the foregoing indemnity and which shall have occurred prior to such termination.

11. **Compliance with the Laws** With respect to the transportation services provided herein, CARRIER shall comply, and cause its independent contractors, subcontractors, or owner operators to comply, with all applicable Federal, state and local laws, rules, regulations and ordinances, including, but not limited to all rules and regulations promulgated by the DOT and all other federal and state agencies and departments having jurisdiction over the transportation services to be performed. CARRIER shall defend, indemnify, and hold JBHT and its Customers harmless from and against any and all fines, penalties, judgments, liabilities, expenses and costs of any nature whatsoever arising or resulting from CARRIER's or its independent contractors, subcontractors, or owner operators' failure to comply with all such laws, rules, regulations and ordinances.

12. **Force Majeure.** Non-performance caused by acts of God or government, fire, riots, wars, strikes, labor disturbances, major snow storms, natural catastrophes, or other circumstances beyond the control of the Parties shall be excused to long as the hindrance to performance exists. CARRIER will notify JBHT immediately upon incurring any Force Majeure condition which prevents their performance under this OCA.

13. **Notices.** Any notice required by this OCA shall be in writing and sent via certified mail, return receipt requested or by overnight courier to:

CARRIER                JBHT:

Borderlanders Inc      J.B. Hunt Transport. Inc.

148 Oakville Dr Apt 1B   615 J.B. Hunt Corporate Dr.

                         P.O. Box 130

Pittsburgh, PA 152204420 Lowell, AR 72745

Attn: Director of Litigation

14. **Term/Termination.** The term of this OCA shall begin on the last date it is executed by either of the parties or the acceptance of CARRIER of any Tender from JBHT pursuant to this OCA, whichever occurs first, and shall continue for a term of one year. The OCA shall be renewed automatically from year to year thereafter. Provided, however, that either party may terminate this OCA at any time during the initial term or any renewal term by giving the other party no less than thirty (30) days prior written notice. Termination of this OCA shall also constitute termination of any Amendment hereto. The obligations reflected in paragraphs 4.2, 6, 8, 9, 10 and 13 shall survive the termination of this OCA.

15. **Choice of Law and Forum/Savings Clause.** This OCA and any addenda and any conflict arising thereunder shall be subject to all applicable United States federal law and the laws of the State of Arkansas, without regard to its conflict of law rules. The parties agree that for all claims personal jurisdiction and venue shall be in the State of Arkansas and CARRIER agrees to waive any and all objections thereto. If any part of this OCA is deemed to be in violation of any law, such part shall be severed form this OCA and the remaining provisions of the OCA shall continue in full force and effect.

16. **Confidentiality.** Carrier acknowledges that any and all information emanating from JBHT's or its Customer's business, in any form, including any compilations or otherwise nonpublic information is "Confidential Information" and Carrier shall not, during or after the term of the Agreement for five years, permit the duplication, use or disclosure of any such Confidential Information to any person (other than its own employees, agent or representative who must have such information for the performance of its obligations hereunder), unless such duplication, use or disclosure is specifically authorized by JBHT or its Customer. Carrier shall be responsible for any unauthorized disclosure made by any of its employees, agents, or representatives and shall take reasonable precautions to prevent such disclosures. Carrier acknowledges that the unauthorized disclosure or use of JBHT's or its Customer's Confidential Information would cause irreparable harm, the degree of, which may be difficult to ascertain. Accordingly, Carrier agrees that JBHT or its Customer will as a matter of right be entitled to obtain an immediate injunction, without posting of bond, enjoining any actual or proposed breach of this Agreement, as well as the right to pursue any and all other rights and remedies available at law or in equity for such a breach.

This OCA is executed this 14th day of November, 2019. By doing so, each signatory represents that it has been or is specifically authorized to execute contracts on behalf of the entity they represent.

## ATTACHMENT A TO OCA J.B. HUNT CARGO CLAIMS AND ACCIDENT REPORTING PROCEDURES

1. **ACCIDENTS** All accidents/events, meeting the criteria outlined below, should be reporting to J.B. Hunt's safety/claims department (1-800-723- 9029). The phones are staffed 24 hours per day 365 days per year. All reportable accidents/events should be reported to the safety/ claims office within 2 hours of the occurrence. The only exception to that requirement is an accident/event that results in a fatality and that should be reported immediately.
   Any accident/event that could potentially result in cargo damage
   Any accident/event that results in a fatality
   Any accident/event that results in a serious injury (defined as any life altering or life threatening injury). Examples of these would include but not necessarily be limited to amputations, loss of bodily functions, loss of eyesight, etc.
   Any accident/event expected to result in losses totaling more than $50,000
   Any accident/event involving J.B. Hunt equipment (i.e. trailers or containers)
   Any accident/event involving J.B. Hunt employees. (i.e. spotters)

2. **CARGO CLAIMS**
   **Loss and Damage**
   Cargo claims, whether they are caused by shortage or damage, are an expense that can be reduced with your assistance. Call JBHT Cargo Claims (OS&D Dept.) from the shipping or receiving dock, or anywhere in transit, when you have cargo damage, overage, shortage, or other discrepancy. JBHT Cargo (OS&D) can be reached at 800-723-7106 24 hours per day, 7 days per week, 365 days per year.

   Each load has its own JBHT load number, which is to be shown on all paperwork. It is to be placed in the top right hand corner of the Bill of Lading, or as close as possible to the top right hand corner.

   **When to Call**
   1. *Anytime there is an exception at the time of delivery; overage, shortage, damage, or simply seal exception.*
   2. If a shipper refuses to seal the load or place the seal number on the paperwork.
   3. Anytime during transit, while doing your regular equipment checks, if you notice a seal has been broken, or compromised.
   4. When picking up a unit at a rail yard, call in if you see a different seal number than what is on the bills, or if you see any trailer damage. PELASE MAKE SURE that you note these exceptions on the rail outgate report, as well as reporting to the rail police.
   5. When picking up a unit at a drop yard, call in if seal is different than what is on the BOL, or if seal is missing.
   6. Anytime there is any kind of mishap during transit that could affect cargo, such as an accident or incident.

   If the cargo to be loaded is in poor condition or the count is wrong, tell the shipper. If a disagreement occurs, call JBHT Cargo/OS&D before loading or signing for the load.

   **Steps to Take to Avoid Cargo Claims**
   1. **Shipper Load and Driver Count (SLDC):** Check condition and count. It will take longer to ensure an accurate count, but take your time! Have the shipper seal the load and note the correct seal number on all copies of Bill of Lading.
   2. **Shipper Load and Count (SLC):** Be sure bills of lading show correct seal number and Shipper's responsibility by the statement "Shipper's Load and Count, or SLC".
   3. **Driver Loads and Counts (DLC):** Driver responsible for the cargo count, as well as ensuring proper loading, blocking, and bracing of the load for transit.
   4. **Driver Unload (DU):** Always break the seal in presence of receiver and have him/her sign "Seal # ___ intact" on BOL.

5. **Receiver Unload/Driver Assist (RUDA):** If any damages, shortages, or overages are noted, call OSD at 800-723-7106 immediately before leaving the receiver.
6. **Receiver Unload (RU):** When dropping a trailer, have the receiver, or receiver's agent, sign "Seal#_____ intact" on the BOL. If a Live unload, and any damages, shortages, or overages occur, call OSD immediately before leaving the receiver.

If a load shifts during transit and has to be corrected, the CARRIER in possession of the load at the time the load shift is discovered is responsible for any fees to get the load corrected. The Claims OS&D group can help the CARRIER find a vendor to help with this, but the CARRIER will be billed, not JBHT. The same will be true for instances of correcting overweight trailers, or transloading freight because of equipment problems.

3. **CARGO SECURITY** CARRIER shall comply with generally accepted industry standards regarding cargo security and CARRIER's insurance policy requirements.

### ATTACHMENT B TO OCA EXTRA REQUIREMENTS FOR HAZARDOUS MATERIALS SHIPMENTS

For any shipment arranged by JBHT to be transported by CARRIER involving the transportation of hazardous materials, the parties agree the following provisions shall apply, in addition to provisions in the OCA to which this Appendix is attached:

1. CARRIER represents and warrants that it holds all Federal and/or state permits and registrations necessary to transport hazardous materials. CARRIER shall provide JBHT copies of all appropriate documents upon JBHT's request.
2. CARRIER shall immediately notify JBHT of (a) any revocation or suspension of its permits and registrations described in section 1, above, and of (b) any change in its USDOT safety rating.
3. CARRIER also represents and warrants all of its drivers shall be, at the time they transport any hazardous material shipment, (a) properly trained under Federal and state laws, including, as example, 49 CFR §§172.700 and 177.800, and (b) have the proper endorsements on their Commercial Driver's License to transport such shipments.
4. CARRIER shall comply with all Federal, state, and local laws regarding the transportation of hazardous materials, including, as example, 49 CFR Parts 172 and 397.
5. If CARRIER is tendered a shipment of hazardous materials it must maintain, at a minimum $1 million ($US) liability coverage under 49 CFR §387.9. CARRIER shall ensure that it procures and maintains, at its sole expense, public liability and property damage insurance from a reputable and financially responsible insurance company insuring CARRIER for at least $1 million ($US) per occurrence. Such insurance shall name CARRIER and JBHT as insureds for any and all liabilities for personal injuries (including death) and property damage, including environmental damage due to the release of a hazardous substance and/or hazardous material, arising out of or in any way related to CARRIER's transportation operation. As evidence of this coverage, CARRIER shall provide JBHT a copy of the proper hazardous materials endorsement evidencing such coverage.

Name of Authorized Carrier Representative: Frank Akron
Title of Authorized Carrier Representative: CEO
Phone number of Authorized Carrier Representative: 412-721-5835
Email of Authorized Carrier Representative: info@borderlandersinc.com

Agreement Date: 11/14/2019
☑ "I, Frank Akron, am the CEO for Borderlanders Inc. I am authorized to execute the Transportation Brokerage Agreement (the "Agreement") set out above dated 11/14/2019 2:20:23 PM between JB Hunt and Borderlanders Inc and legally bind the Borderlanders Inc to the terms and conditions set forth therein. This electronic signature serves as an original, and any electronic version and other signatures are incorporated as if originals into the Agreement. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON BORDERLANDERS INC. I UNDERSTAND AND ACKNOWLEDGE THAT BORDERLANDERS INC IS THE "CARRIER" AS THAT TERM IS USED IN THE AGREEMENT."

# EXHIBIT E



December 18, 2025

<u>**VIA ELECTRONIC MAIL**</u>

Mr. Benjamin Mackey
Litigation Counsel, J.B. Hunt
E-mail: benjamin.mackey@jbhunt.com

> Re:   ***Crystal Gee, et al. v. J.B. Hunt Transport, Inc., et al., United States District Court** – District of Arizona, Division 1 – Case No. CV-24-08064-PCT-SMM (the "Action")*
> Policy No: 38675622AA (December 31, 2022 – December 31, 2023)
> ITAL Ref. No.: 008/23/19601
> Date of Loss: October 10, 2023
> Our File No.: 925.162260

Dear Mr. Mackey,

Please be advised that we have been retained as coverage counsel on behalf of Chaucer Insurance Company DAC, Lloyd's Syndicate Chaucer 1084, and Houston Casualty Company (hereinafter collectively referred to as "Underwriters") as subscribers to Policy No. 38675622AA (the "Policy") issued to J. B. Hunt Transport, Inc. ("J.B. Hunt" or the "Assured"), regarding J.B. Hunt's demand for coverage for the bodily injury claims at issue in the above-referenced Action.

We write to provide Underwriters' preliminary coverage position, reservation of rights, and requests for additional information. Please be advised that Underwriters' coverage investigation is ongoing. Underwriters reserve all rights, waiving none. Notwithstanding, if you disagree with any facts or positions set forth in this correspondence, we ask that you please provide the basis for your disagreement in writing accompanied by all supporting documentation for Underwriters' consideration.

<u>**EXECUTIVE SUMMARY**</u>

On April 2, 2024, Plaintiffs filed suit against J.B. Hunt, Borderlanders, LLC ("Borderlanders"), and driver Shokhijakhon Bekmuradov ("Bekmuradov") in the United States District Court for the District of Arizona, alleging that an October 10, 2023, head-on collision near Kayenta, Arizona, was caused by Bekmuradov's negligent operation of a tractor-trailer under J.B. Hunt's authority. The collision resulted in the deaths of Gregory Cox and Lindsey Watson, and serious injuries to their three minor children.

Plaintiffs not only plead allegations of negligence against J.B. Hunt as a freight broker, they allege that the Assured acted as a motor carrier and assert claims for wrongful death, survivorship, and personal injury premised on i) vicarious liability (as a motor carrier and statutory employer of Bekmuradov), ii) direct negligence in hiring, supervision, entrustment, and retention of Bekmuradov (negligent hiring of a statutory employee); and iii) direct

FORAN GLENNON (UK) LLP

Helen Franzese      +44 (0) 20 3530 7754    hfranzese@foranglennon.co.uk
11 Leadenhall Street, Third Floor, London, EC3V 1LP      www.foranglennon.co.uk

Chicago | Irvine | San Francisco | New York | London | Denver | Nashville | Sacramento | San Jose | Tampa

Foran Glennon (UK) LLP (the "LLP") is a limited liability partnership registered in Wilmington, Delaware, U.S., with a registered number 6261723. The LLP is authorised and regulated by the Solicitors Regulation Authority, SRA ID Number 821283. A list of names of the partners is available for inspection at the LLP's business address, 11 Leadenhall Street, Third Floor, London EC3V 1LP. The word "partner" denotes a partner in the LLP, or a consultant or employee with equivalent standing and qualifications. Foran Glennon Palandech Ponzi & Rudloff PC is a firm with which the LLP is affiliated and which trades from offices across the US.
3113606.1

negligence in the hiring, supervision, and retention of Borderlanders.[1] J.B. Hunt filed a Motion to Dismiss Plaintiffs' Amended Complaint arguing, essentially, 1) that it was a broker, not a motor carrier, and 2) preemption under the FAAA prohibits the Action as against J.B.Hunt where it acted solely as a freight broker. However, on October 21, 2024, the Court denied same finding "that plaintiffs have plausibly alleged that J.B. Hunt acted as a motor carrier, not a broker, in relation to the shipment transported by Borderlanders' driver Bekmuradov," and "have plausibly stated claims for negligent hiring and vicarious liability."

We understand that the Action is ongoing and that a mediation will be scheduled for the first quarter of 2026. We also understand that depositions are soon to complete and there is currently a dispositive motion deadline of February 15, 2026.

The Policy contains the following coverage parts: Errors and Omissions (Section 4 - Clause 79); Third Party Liabilities (Section 4 – Clause 80); and Transportation Broker Liability (Section 5 – Clause 82). No coverage is provided under Section 1 (Freight Services Liability) and Section 2 (Shippers Interest) as there are no limits of liability set forth in the Policy's Declarations.

Underwriters hereby provide their preliminary coverage position and reservation of rights under the Policy, based on the information currently made available to them, as follows.

- **Errors & Omissions (Section 4 - Clause 79)**: This coverage part applies only to professional-duty errors or omissions that result in financial loss to a third-party or physical loss or damage to cargo. It does not extend to claims involving bodily injury or death. As the Amended Complaint asserts claims arising from personal injury and wrongful death, rather than financial or cargo loss, the Errors & Omissions coverage part does not apply.

- **Third-Party Liability (Section 4 - Clause 80)**: Underwriters hereby deny coverage under this Section where J.B. Hunt's potential liability arises from the "use" of a "truck". While Clause 80 may, generally, provide coverage for bodily injury arising out of the Assured's Insured Services, Clause 81 expressly excludes coverage for liability arising from the use or operation of any truck or motor vehicle. See Clause 81.1(a) As the claims in this matter arise from the operation of a tractor-trailer, this exclusion applies, and coverage is, therefore, denied under this Section.

- **Transportation Broker Liability (Section 5 - Clause 82)**: Underwriters hereby the reserve right to deny or limit coverage under the Transportation Broker Liability Section – Clause 82, where J.B. Hunt's liability does not arise from its "service as a transportation broker". This coverage part may respond, subject to its full terms and conditions, only if J.B. Hunt acted in the capacity of a transportation broker, arranging carriage through an independent motor carrier, such as Borderlanders, and not as a motor carrier itself. At present, both the Amended Complaint and plaintiffs' position in the litigation is that J.B. Hunt was acting as a motor carrier and/or that the driver was its statutory employee. In fact, the Court expressly refused to dismiss the claims in the Action as against J.B. Hunt based on motor carrier liability. Accordingly, Underwriters

---

[1] See Plaintiffs' Amended Complaint, and the court's 21 October 2024 Order regarding J.B. Hunt's Motion to Dismiss – 8:8-19 and 9:9-12.

hereby deny coverage under this Section to the extent J.B.Hunt's liability is based on it having acted, or being deemed to have acted, as a carrier (and for any negligence claims arising from a statutory relationship with the driver). As to the claims brought by plaintiffs arising from J.B. Hunt's role as a freight broker, Underwriters hereby reserve the right to deny or limit coverage under Clause 82 where the Assured is not legally liable for plaintiffs' loss. Underwriters await further clarification of J.B. Hunt's role and determination of legal liability, if any, for the transportation at issue. Underwriters note that should the Court determine Plaintiffs' state-law negligence claims are preempted under the Federal Aviation Administration Authorization Act (FAAAA) or the Interstate Commerce Commission Termination Act (ICCTA), no legal liability would exist against J.B. Hunt. In that event, no indemnity would be payable under the Policy.

- **J.B. Hunt's Insurance Program:** Underwriters also reserve all rights regarding the attachment point of the Policy. If coverage is triggered, the Policy's $5,000,000 limit applies in excess of all underlying insurance, including J.B. Hunt's $500,000 self-insured retention, the $1,500,000 Chubb primary policy, and any insurance applicable to Borderlanders as the motor carrier. Underwriters' obligations, if any, will arise only after all underlying coverage has been fully exhausted. As J.B. Hunt's liability may be based on its operation as a motor carrier, Underwriters hereby demand that J.B. Hunt's motor carrier liability insurers and/or the Assured itself on behalf of the $18 million Corridor SIR, are required to respond for this claim in conjunction with any coverage which may potentially be provided under the Policy, until such time as a final determination of J. B. Hunt's liability has been made. Underwriters reserve the right to seek contribution as against J.B. Hunt and its motor carriers accordingly.

- **No Duty to Defend:** Please note that the Policy does not include a duty to defend. Moreover, Underwriters have no present obligation to provide or fund a defense to J.B. Hunt. Any potential indemnity obligation would arise only after a determination of the Assured's liability and coverage under the Policy.

This summary is subject to the detailed analysis set forth below and does not waive any of Underwriters' rights under the Policy or at law. Underwriters expressly reserve all rights to amend or supplement this coverage position as discovery, additional information, and the ongoing litigation clarify J.B. Hunt's role, its legal liability, and the applicability of underlying or other insurance, including any insurance and/or J.B. Hunt's $18M Corridor Self-Insured Retention arising from its operations as a carrier.

## BACKGROUND

### The Action

On April 2, 2024, Plaintiffs filed a Complaint against defendants, J.B. Hunt, Borderlanders, and Bekmuradov for personal injuries and wrongful death arising from an automobile accident that occurred on October 10, 2023, near Kayenta, Arizona. At the time, Bekmuradov, a 26-year-old driver employed by Borderlanders, was transporting 1,900 pounds of medical equipment pursuant to an Outsource Carrier Agreement ("OCA") between J.B. Hunt and Borderlanders.

At approximately 8:38 p.m., while driving a 70-foot tractor-trailer westbound on U.S. Route 160, Bekmuradov attempted to pass a recreational truck and trailer by moving into oncoming traffic. He ignored both the end of the passing zone and a "No Passing Zone" sign, continuing at over 65 mph as another vehicle carrying a family approached from the opposite direction. His truck collided head-on with a vehicle driven by Gregory Cox, age 44, accompanied by Lindsey Watson, age 39, and their three minor children. The crash destroyed their vehicle, killing Gregory and Lindsey instantly, and leaving their three minor children with life-threatening injuries.

Dash camera footage showed Bekmuradov was inattentive to the roadway, likely distracted by his phone, and failed to react until it was too late. The Complaint alleges his conduct was negligent, reckless, and a violation of Arizona traffic laws including A.R.S. §§ 28-725, 28-726, and 28-727.

The Complaint alleges that J.B. Hunt acted as a motor carrier. Specifically, it states:

> Unlike a mere broker, JB Hunt accepted, arranged for, and legally bound itself to the transport of the subject shipment, which it was authorized to ship as a licensed interstate motor carrier. JB Hunt cannot insulate itself from liability for negligence occurring in the conduct of its business by making an arrangement with so-called independent contractors such as Borderlanders to transport freight for it. JB Hunt's duty to safely operate its transportation services on public highways was nondelegable. (paragraph 37)

The Complaint asserts negligence claims against J.B. Hunt in two ways:

- First, Plaintiffs allege that J.B. Hunt is vicariously liable as a licensed interstate motor carrier for the negligence of Bekmuradov. Specifically, Plaintiffs claim that under federal law, J.B. Hunt is deemed the statutory employer of Bekmuradov and therefore cannot evade responsibility for his conduct while transporting cargo under J.B. Hunt's operating authority. (Paragraphs 35-37)

- Second, Plaintiffs allege that J.B. Hunt was independently negligent in its hiring, supervision, entrustment, and retention of Borderlanders, the outsourced carrier that employed Bekmuradov. They contend that J.B. Hunt knew or should have known of Borderlanders' history of hiring inexperienced or incompetent drivers, thereby exposing the public to unreasonable risks. (Paragraph 38)

**Motion to Dismiss**

We understand that J.B. Hunt, through Thorpe Shwer, P.C., filed a Motion to Dismiss arguing that Plaintiffs' claims were preempted by the Federal Aviation Administration Authorization Act ("FAAAA") and the Interstate Commerce Commission Termination Act of 1995 ("ICCTA") as J.B. Hunt acted solely as a federally licensed broker, not a motor carrier. The motion also contended that Plaintiffs failed to state plausible claims for negligent hiring, supervision, entrustment, or vicarious liability, as Borderlanders, not J.B. Hunt, was the carrier responsible for the load.

Plaintiffs opposed the motion, arguing that J.B. Hunt accepted and legally bound itself to transport the shipment under 49 C.F.R. § 371.2(a), making it a motor carrier for this transaction. They emphasized that federal "statutory employment" regulations impose carrier liability even when transportation is outsourced and further argued that their claims fell within the FAAAA's safety exception, citing *Miller v. C.H. Robinson* to show that negligence claims involving roadway safety are not preempted.

The Court ultimately denied J.B. Hunt's Motion to Dismiss, holding that whether J.B. Hunt acted as a broker or as a motor carrier is a factual issue not resolvable at the pleading stage. The Court reasoned that under 49 C.F.R. § 371.2(a), if J.B. Hunt accepted the shipment as a carrier in the eyes of the shipper, it could not simultaneously act as a broker. The claims against J.B. Hunt therefore survived, with the broker-versus-carrier determination reserved for summary judgment after the parties develop evidence of the arrangement between J.B. Hunt, Borderlanders, and the shipper (Lincare, Inc.). If our understanding of these procedural events is incorrect, please let us know.

**The OCA**

On October 26, 2022, J.B. Hunt and Borderlanders entered into the OCA. The OCA requires Borderlanders to provide and control the drivers and equipment, comply with all applicable motor carrier safety regulations, maintain specified insurance (including $1 million in auto liability and $100,000 in cargo liability), and defend, indemnify, and hold harmless J.B. Hunt for claims arising from Borderlanders performance of services under the OCA.

Notably, although the Court acknowledged the existence of the OCA in its decision on J.B. Hunt's motion to dismiss, it declined to treat the agreement as conclusive evidence that J.B. Hunt acted solely as a broker rather than as a motor carrier at the time of the accident.

**Demand to Borderlanders**

Per J.B. Hunt's Defense Counsel Report dated June 18, 2025, J.B. Hunt tendered its defense in the Action to Borderlanders. At the time of the accident, Borderlanders was insured under a Prime Insurance Company policy (No. SC22100786) with a coverage period of October 27, 2022 to October 27, 2023, providing $1 million in commercial liability limits. To date, Borderlanders has not disclosed the existence of any excess or additional insurance policies. *Please provide an update regarding the status of J.B. Hunt's tender, including confirmation as to whether Borderlanders and/or its insurer has accepted the defense, and whether any other potentially applicable coverage has been identified.*

**The Policy**

J.B. Hunt is the named insured on the Policy, effective December 31, 2022 to December 31, 2023. The Policy contains the following coverage parts and limits: Section 4 (Clause 79) Errors and Omissions ($1 million per occurrence/aggregate and excess of the deductible); Section 4 (Clause 80) Third Party Liabilities ($5 million per occurrence and excess of the deductible); and Section 5 (Clause 82) Transportation Broker/ Contingent Auto Liability ($5 million per occurrence and excess of the deductible). The deductible for each coverage part is $2,000,000 per occurrence, with a $2,000,000 deductible for Legal Expenses.

<u>**COVERAGE ANALYSIS**</u>

**I.      There is No Coverage for Punitive Damages.**

Underwriters deny coverage for any portion of this claim seeking punitive, exemplary, penalty, or multiple damages. Clause 40.12 of the Policy expressly excludes coverage for such damages,

> **40.12. PUNITIVE OR EXEMPLARY DAMAGES EXCLUSION CLAUSE**
>
> Except to the extent provided under the Errors & Omissions Clause in the Insured Risks section of the Policy, in  no case shall the Policy cover any actual or alleged claim loss damage liability or expense directly or indirectly caused by or contributed to by or arising from any punitive, exemplary, penalty or multiple damages awarded against the Assured or any person for whom the Assured may be held liable.

To the extent that any judgment or settlement includes amounts characterized as punitive, exemplary, penalty, or multiple damages, those amounts are expressly excluded from coverage under the Policy.

**II.     Coverage under Section 3 - Errors and Omissions does Not Apply.**

There is no coverage under Section 3 - Errors and Omissions for Plaintiffs' claims.  Clause 79 only covers professional-duty errors resulting in financial loss to a consignor/consignee or liability to customs authorities. It does not extend to third-party bodily injury or death. Plaintiffs' claims arise from a fatal highway accident, not from clerical errors, faulty arrangements, or customs compliance issues. Accordingly, Underwriters deny coverage under this Section.

**III.    There is No Coverage Under Section 4 - Third Party Liabilities (Clause 80) where Plaintiffs' Bodily Injury Claims Arise from the Use of a Truck.**

Clause 80, Third Party Liabilities, provides in relevant part:

> Subject to the limit of liability and the terms and conditions of this policy, we will pay all sums which you become legally liable to pay resulting from an *occurrence* happening during the *period of insurance* and arising out of the *insured service(s)* "*as per declaration page*" for:
>
> We indemnify you for your liability arising from the following:
>
> 1) Non contractual liabilities at law
>
>> A) Accidental loss/damage of third party property;
>>
>> B) Accidental bodily injury to or disease incurred by any person death,

3113606.1

Injury or illness of any third party

C) consequential loss resulting from (a) and (b) above

D) Pollution clean up and removal

…

In no case shall the Insurer be liable under this Third Party Liability Clause for an amount greater than the Third Party Limit of Indemnity specified in the Policy Schedule

Clause 80(1)(B) provides coverage of the Insured's liability for accidental bodily injury and death to any person during the Policy's effective term. The operative complaint alleges precisely such injuries and deaths. However, any coverage potentially afforded under Clause 80(1)(B) is subject to Clause 81, Third Party Liability Exclusions, which provides in pertinent part:

**Excluding *your* liability in consequence of**:

1) **the** existence, maintenance or **use of**:

(a) **any licensed truck,** licensed automobile or other licensed mechanically propelled vehicle
(b) **any unlicensed truck**, unlicensed automobile or other unlicensed mechanically propelled vehicle used outside your premises.

[*Boldface added.*]

The plain language of this exclusion eliminates coverage for accidents involving any truck, regardless of whether it is licensed. Clause 81(1)(a) excludes liability arising from the use of any licensed truck, without limitation as to location. Clause 81(1)(b) excludes liability arising from the use of any unlicensed truck when operated outside the Assured's premises.

The Amended Complaint alleges that Bekmuradov was operating a commercial tractor-trailer on a public highway at the time of the accident. Although the pleadings do not specify whether the vehicle was licensed, the accident falls within the scope of Clause 81 regardless of its status: if licensed, Clause 81(1)(a) applies; if unlicensed, Clause 81(1)(b) applies because the vehicle was being operated outside the Assured's premises.

On the plain language of Clause 81, coverage for this accident is excluded under either scenario. Accordingly, Underwriters deny coverage under Section 4 (Clause 80) on this basis.

IV.     **Coverage under Section 5, Clause 82 - Transportation Broker Liability, is Barred where J. B. Hunt's Liability does Not Arise from its Services as a Freight Broker, but a Motor Carrier; Moreover, Coverage under Clause 82 does Not Apply where J.B. Hunt's has No Legal Liability for the Loss at Issue.**

Section 5, Clause 82, provides in pertinent part:

> A) This policy insures you **for liabilities arising from your service <u>as a transportation broker</u>** where such service **includes the arrangement for the transportation of cargo on a public road** in the USA or Canada **by a motor carrier which you hire.**
>
> …
>
> C) The insurance provided by this Coverage Form will not act as a substitute for any compulsory "auto" insurance. **<u>We do not insure the hired motor carrier for any limit either in addition to, or in excess of, its automobile liability insurance.</u>**
>
> …
>
> In no case shall the Insurer be liable under this Transportation Broker Liability Clause for an amount greater than the Transportation Broker Liability Limit of Indemnity specified in the Policy Schedule

Clause 82 provides coverage for liabilities arising from the Assured's service as a transportation broker where it arranges transportation of cargo by a motor carrier it hires. Coverage under this clause is expressly limited to J.B. Hunt's broker capacity and does not extend to liability if J.B. Hunt is determined to have acted as a motor carrier. If the Court ultimately finds that J.B. Hunt acted as a broker, Clause 82 may respond to such liability. If J.B. Hunt is deemed a motor carrier, the coverage under Clause 82 does not apply.

Here, plaintiffs have asserted in the operative complaint and through the course of the litigation that J.B. Hunt was acting as a motor carrier and/or that the driver was its statutory employee (under the facts and by operation of law). Although J.B. Hunt denies plaintiffs' allegations, when presented with the opportunity to dismiss the carrier liability allegations against J.B. Hunt, the Court expressly refused to do so.

The October 21, 2024 Order on J.B. Hunt's Motion to Dismiss clearly sets forth the issue as examined by the Court:

> **JB Hunt argues that Plaintiffs' claims against it must be dismissed under Rule 12(b)(6) because JB Hunt acted as the freight broker, rather than the motor carrier**, of the medical equipment shipment that Bekmuradov was transporting at the time of the incident. JB Hunt argues that, as the broker, the Federal Aviation Administration Authorization Act ("the FAAAA") expressly preempts claims against JB Hunt for any negligence of Borderlanders and/or Bekmuradov. Even

if Plaintiffs' claims are not preempted by the FAAAA, JB Hunt argues that Plaintiffs have failed to state a claim for negligent hiring, supervision, retention, entrustment, and retention against JB Hunt, and that Plaintiffs' claims for vicarious liability against JB Hunt fail **due to JB Hunt's status as a broker.**

Plaintiffs counter that **JB Hunt acted as a motor carrier, rather than a broker under the meaning of the FAAAA**, a fact which Plaintiffs allege in the Complaint. Plaintiffs argue that **"[a] motor carrier, like JB Hunt, that accepts responsibility for ensuring the delivery of goods, acts as a motor carrier regardless of whether it ships the goods in its own truck or outsources the shipment to a non-owned truck and driver."** (… citing 49 C.F.R. § 371.2). The issue of whether JB Hunt acted as a motor carrier or a broker, Plaintiffs argue, **is a factual issue that requires discovery of relevant evidence**, such as the contract between JB Hunt and the entity that contracted for the shipment of the medical equipment (the "Shipper"). (Id. at 5–6).

October 21, 2024 Order ("Order"), p. 3. (citations omitted)(*emphasis added.*)

The Court continued:

The Court agrees with Plaintiffs that the determination of whether JB Hunt acted as a broker or a motor carrier **requires a factual inquiry that the Court should not undertake on a motion to dismiss**, where the Court is bound to accept Plaintiffs' factual allegations as true. **While JB Hunt's arguments based on § 13102 are straightforward, the issue is somewhat complicated by the definition of a "broker" provided by the Code of Federal Regulations,** which both JB Hunt and Plaintiffs cite to in some capacity as support for their arguments**. The section relied upon by Plaintiffs for their contention that JB Hunt acted as a motor carrier, rather than a broker, reads as follows:

Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. **Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.** 49 C.F.R. § 371.2(a).

Plaintiffs emphasize the text of the regulation reading "[m]otor carriers . . . are not brokers . . . when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." (Doc. 14 at 5, 7). **<u>Plaintiffs contend that JB Hunt was authorized and legally bound to transport the medical equipment for the Shipper and that, as such, JB Hunt acted not as a broker in relation to the transaction, but as a motor carrier</u>**. (Id. at 8).
…
Indeed, courts deciding liability issues under the Carmack Amendment have found that the question of whether an entity acted as a broker or a motor carrier **<u>hinges on whether the entity accepted legal responsibility for the shipment</u>**. …

The Court's conclusion that JB Hunt's status is dependent on the Shipper's arrangement with JB Hunt finds support elsewhere in the federal regulations. For instance, § 371.7 provides that "A broker shall not, directly or indirectly, represent its operations to be that of a carrier." 49 C.F.R. § 371.7. Put differently, **if JB Hunt accepted the shipment as a carrier in the view of the Shipper, arguably JB Hunt could not, then, act as a broker in arranging for Borderlanders to transport the shipment**."

Order, pp. 5-7.

The Court ultimately concluded, "**Plaintiffs have plausibly alleged that JB Hunt acted as a motor carrier, not a broker,** in relation to the shipment transported by Borderlanders' driver Bekmuradov. The Court further finds that **Plaintiffs have plausibly stated claims for negligent hiring and vicarious liability.**" Order, p. 11. Accordingly, BOTH the motor carrier liability allegations and the freight broker allegations remain at issue in the litigation as against J.B. Hunt, leaving the possibility that J.B. Hunt's liability may be based on a determination that it acted as a motor carrier, and not a freight broker.

We understand that discovery is ongoing, and that a number of fact depositions have been taken, including Mr. Kurt Vosmera, the R. 30(b)(6) Deposition of Lincare, the Shipper, and Mr. Nicholas Cates, an employee of J.B. Hunt involved in the booking of the load*. We ask that you please provide us with a complete copy of Mr. Vosemera and Mr. Cates' deposition testimony as soon as possible.* We also understand that Mr. Steve Umbower has been/will be deposed. *Please provide us with a complete copy of his deposition testimony when available. We also ask that you please provide us with a signed copy of the OCA between Borderlanders and J.B. Hunt.*

3113606.1

Notably, defense counsel's summary states:

> […] Plaintiffs will contend that J.B. Hunt was the motor carrier because it was "authorized to transport" the Load, and "legally bound itself" to transporting it. See 49 C.F.R. 371.2(a). Plaintiffs and their trucking liability expert, Thomas Corsi, rely upon the following facts to support this argument:
>
> • J.B. Hunt had motor carrier authority to transport the Load.
>
> • J.B. Hunt acted as the motor carrier for this Load, not a broker because **it failed to specify in writing pursuant to "MAP-21 Legislation, 49 U.S.C. § 13901(c)" what authority it (J.B. Hunt) was providing transportation services. As a result, J.B. Hunt cannot rely on the language in the Rate Agreement sent to Lincare that it had authority to operate both as a broker and as a motor carrier**.
>
> • J.B. Hunt allegedly held itself out to Lincare as the motor carrier responsible for the Load:
>
> • J.B. Hunt prepared and sent the BOL to Lincare, which does not indicate another carrier would be transporting the Load.
>
> • J.B. Hunt's Rate Agreement included "line haul and fuel charges."
>
> • J.B. Hunt legally bound itself to transporting the Load.
>
> • Cates' emails to Lincare regarding the Load used the terms "we" and "my operations team," referring to J.B. Hunt, suggesting that J.B. Hunt was the responsible motor carrier.

Defense Counsel's Early Case Assessment and Status Report, dated December 2, 2025, p. 20. (*Emphasis added*.)

Moreover, J.B. Hunt's own defense counsel rates the likelihood of J.B. Hunt's liability for "vicarious liability and negligent hiring" as "POSSIBLE". Defense Counsel's Early Case Assessment and Status Report, dated June 18, 2025, p. 28; Defense Counsel's Early Case Assessment and Status Report, dated 2 December 2025, p. 28.

Accordingly, Underwriters expressly reserve all rights under Clause 82 of the Policy. To the extent that J.B. Hunt's liability arises from/is based on its provision of services as a transportation broker in arranging carriage by Borderlanders, coverage may apply under this clause, subject to all terms, conditions, limitations, and exclusions of the Policy. However, if J.B. Hunt's liability arises from/is based on activities performed as a motor carrier, Clause 82 does not apply, and coverage is denied under the Policy on that basis.

- **FAAAA/ ICCTA Preemption**

Underwriters note that if J.B. Hunt is determined solely to have acted as a broker, a key issue in the underlying litigation will be whether Plaintiffs' negligence-based claims are preempted by federal law—specifically, the FAAAA and its 1995 amendment, the Interstate Commerce Commission Termination Act ("ICCTA"). The FAAAA expressly preempts any state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier or broker with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). The ICCTA similarly extends preemption to intrastate rates, routes, or services of brokers. 49 U.S.C. § 14501(b)(1).

Underwriters further note that both Clause 80 (Third-Party Liability) and Clause 82 (Transportation Broker Liabilities) indemnify J.B. Hunt only where it is legally liable for the loss or damage. If Plaintiffs' claims are determined to be preempted by the FAAAA or ICCTA, then no legally cognizable cause of action would remain against J.B. Hunt as a broker. In that event, there would be no liability under state law for which indemnity could be provided under the Policy.

Accordingly, Underwriters expressly reserve the right to deny coverage for any claims that are determined to be preempted under federal law. Should the Court or any appellate tribunal hold that Plaintiffs' negligence-based claims are barred by the FAAAA or ICCTA, Underwriters' coverage obligations, if any, are not triggered where no actionable liability would exist.

Defense counsel's December 2, 2025, Early Assessment and Case Status Report references the U.S. Supreme Court's grant of certiorari in *Montgomery v. Caribe Transport II, LLC, et al.* Given the potential dispositive impact the Supreme Court's decision may have on this matter, we understand that J.B. Hunt will be considering whether it is appropriate to file a motion for a stay of proceedings until the Supreme Court resolves the split in the circuits, as a favorable decision would provide a complete preemption defense for J.B. Hunt for the negligent hiring, retention and training claims. *Please inform us as to whether J.B. Hunt will be filing a motion to stay the litigation, given the significance of the damages at issue and the direct impact a favorable decision would have on this matter.*

Underwriters expressly request that J.B. hunt keep Underwriters advised of all material developments in a timely manner concerning this litigation, and any upcoming settlement discussions (including the scheduling of the mediation), the preemption issue, including any rulings or filings addressing FAAAA or ICCTA defenses, so that Underwriters may evaluate the potential impact on coverage.

- **Structure of J.B. Hunt's Insurance Program**

We have been provided with limited information regarding J.B. Hunt's insurance program for the period of December 31, 2022 through December 31, 2023. We understand that the program is structured in multiple layers, summarized as follows:

- **$500,000 SIR** (J.B. Hunt)
- **Primary Auto/GL Layer:** $1.5M issued by ACE (Chubb), excess of a $500,000 SIR.

3113606.1

- **Motor Carrier Liability:** $8M excess of $2M (shared between Harleysville and Texas Insurance Co.), subject to an $18M Corridor SIR and a $36M aggregate.
- **Brokerage Liability (concurrent with the Motor Carrier Liability coverage) $8M excess $2M, if liability arises from brokerage activities.** $5M excess of $2M, issued by Lloyd's (Chaucer/HCC)(the Policy).
- **Additional Excess Layers:** Various towers running from $3M x $7M up to $25M x $100M, involving multiple insurers (Chubb, CNA, Axis, Liberty, Fireman's Fund, etc.).

The operation of the $18,000,000 Corridor SIR remains unclear. For instance, it is not yet known whether this corridor applies solely to the motor carrier/general liability program or whether it also affects the broker liability tower.

Underwriters request that J.B. Hunt and its insurance brokers clarify the operation of the $18,000,000 Corridor SIR including whether it applies only to the motor carrier program or also impacts the attachment of the broker liability coverage. We understand that this information may have been provided to counsel in other matters, however, we ask that you please reproduce same. Please also provide copies of all correspondence with any/all insurers including, but not limited to Harleysville and Texas Insurance Companies, at your earliest convenience. These materials are essential to determining which insurers should respond first and in what amounts before the broker liability coverage is implicated.

Underwriters reserve all rights regarding the application of the $18,000,000 Corridor SIR and attachment of coverage under the Policy. Until the structure and operation of J.B. Hunt's insurance program is confirmed, Underwriters maintain the position that the Borderland's $1,000,000 automobile liability limit, together with Chubb's $1,500,000 layer and J.B. Hunt's $500,000 self-insured retention, must be fully exhausted before any obligation under the broker liability coverage arises. Any reimbursement of defense costs or indemnity contribution will remain expressly conditioned upon such exhaustion and a factual determination that J.B. Hunt was acting as a broker in connection with the shipment at issue, and that the claims against the Assured are not preempted under state or federal law.

If J.B. Hunt is evidenced to have acted as a motor carrier rather than a broker, coverage for this loss would fall within its motor liability program, and not under the broker liability coverage subscribed to by Underwriters. J.B. Hunt is requested to keep Underwriters informed of all material developments regarding the operation of its insurance program and any communications with other insurers that may affect the order of attachment or exhaustion of coverage layers.

As J.B. Hunt's liability may be based on its operation as a motor carrier, Underwriters hereby demand that J.B. Hunt's motor carrier liability insurers and/or the Assured itself on behalf of the $18 million Corridor SIR, are required to respond for this claim in conjunction with any coverage which may potentially be provided under the Policy, until such time as a final determination of J. B. Hunt's liability has been made. Underwriters reserve the right to seek contribution as against J.B. Hunt and its motor carriers accordingly.

Regarding the mediation anticipated to be scheduled in the first quarter of 2026, we ask that you please notify us immediately when the mediation has been scheduled, and that confirm

that J.B. Hunt's motor liability insurers will be participating. *Again, we ask that you please provide us with copies of all correspondence with those insurers.*

\* \* \* \*

We ask that you please provide the information and documentation requested herein as soon as possible. Neither this letter nor any action taken by Underwriters is intended to be or should be construed as a waiver or estoppel of any rights, privileges, or defenses available to the Underwriters under the terms, conditions or provisions of the Policy or applicable law, and such rights, privileges and defenses are expressly reserved.

This letter and the positions set forth herein are based upon the information provided to Underwriters to date. Please let us know if you disagree with any of the facts or conclusions set forth herein and provide the basis for your disagreement in writing with all supporting documentation. Upon receipt, Underwriters will consider this additional information and, if necessary, modify their position as set forth in this letter. Underwriters' continued investigation of this matter is subject to a full and complete reservation of rights and defenses under the Policy and applicable law. This correspondence is not intended, nor should it be construed, as an exhaustive listing of the terms, conditions, and exclusions of the Policy to which Underwriters may have severally subscribed that may bar or limit coverage. Underwriters reserve their right to supplement or modify this correspondence.

If you have any questions or wish to discuss this matter in general, you may also contact me via email at hfranzese@foranglennon.co.uk. We look forward to hearing from you with the requested information.

Very truly yours,

Helen A. Franzese, Esq.

3113606.1

# EXHIBIT F

Law Offices

# McMICKLE, KUREY & BRANCH, L.L.P.

217 ROSWELL STREET, SUITE 200
ALPHARETTA, GEORGIA 30009

www.mkblawfirm.com

TELEPHONE (678) 824-7800
FACSIMILE (678) 824-7801

CHANDLER L. SMITH
csmith@mkblawfirm.com

January 19, 2026

**VIA EMAIL - hfranzese@foranglennon.co.uk**
Ms. Helen Franzese
Foran Glennon (UK) LLP
3rd Floor
11 Leadenhall St.
London, EC3V 1LP

Re:     Crystal Gee, et al. v. J.B. Hunt Transport, Inc.; Borderlanders, Inc. and Shokhijakhon Bekmuradov
        In the U.S. District Court for the District of Arizona

|  |  |  |
|---|---|---|
| Case No. | : | CV-24-08064-PCT-SMM |
| ITAL Ref. No. | : | 008/23/19601 |
| Policy No. | : | 38675622AA |
| Date of Loss | : | October 10, 2023 |
| Our File No. | : | 18350 (CLS) |

Dear Ms. Franzese:

This office is insurance coverage counsel for J.B. Hunt Transport, Inc. ("J.B. Hunt"). I understand you represent Chaucer Insurance Company, Lloyd's Syndicate Chaucer 1804, and Houston Casualty Company (collectively the "Underwriters"), which subscribed to Logistics Operators Policy no. 38675622AA issued to J.B. Hunt for the policy period of December 31, 2022, to December 31, 2023 (the "Policy"). As you know, the Plaintiffs in the above-referenced lawsuit (the "Gee Lawsuit") filed suit against J.B. Hunt, motor carrier Borderlanders, Inc. ("Borderlanders"), and Borderlanders driver Shokhijakhon Bekmuradov alleging claims for injuries sustained in an automobile accident that occurred on October 10, 2023 (the "Accident").

This letter addresses Underwriters December 18, 2025 reservation of rights letter. For the reasons stated below, J.B. Hunt requests that the Underwriters withdraw their reservation of rights for coverage under Clause 82, agree to fully indemnify J.B. Hunt with respect to the claims alleged against it in the Gee Lawsuit in accordance with the limit of coverage provided under Clause 82, and extend settlement authority for the upcoming mediation per J.B. Hunt's prior request. Further, as previously reported to Underwriters, this case is set for mediation on February 20, 2026. Thus, time is of the essence, and J.B. Hunt requests a written response to this letter by January 22, 2026.

The Policy provides a $5,000,000 per occurrence limit of transportation broker liability coverage under Clause 82 in excess of a $2,000,000 deductible. Clause 82 states that "this Policy insures you for liability arising from your service as a transportation broker where such service includes the arrangement for the transportation of cargo on a public road in the USA or Canada by

a motor carrier which you hire." J.B. Hunt's position is simple: the claims alleged against J.B. Hunt in the Gee Lawsuit trigger coverage under Clause 82 because J.B. Hunt arranged for the transportation of cargo by Borderlanders, a motor carrier J.B. Hunt hired, and the Accident occurred while Borderlanders was transporting that cargo. If Underwriters contend that J.B. Hunt did not hire Borderlanders to transport cargo, please advise the undersigned immediately and identify each and every item of real or documentary evidence that Underwriters contend supports their position. Likewise, if Underwriters contend J.B. Hunt did not act as a transportation broker within the meaning of Clause 82 in hiring Borderlanders, please advise the undersigned immediately and identify each and every item of real or documentary evidence that Underwriters contend supports their position.

Underwriters' December 18th letter raises several concerning issues. Each is addressed separately below.

### *The Scope of Coverage Under Clause 82*

First, the December 18th letter states that "Coverage under [Clause 82] is expressly limited to J.B. Hunt's broker capacity and does not extend to liability if J.B. Hunt is determined to have acted as a motor carrier."[1] Clause 82 includes no such limitation, express or otherwise, and the December 18th letter makes no attempt to identify this "express" limitation. Please identify in writing all language in Clause 82 that Underwriters contend precludes coverage for the claims alleged in the Gee Lawsuit. In doing so, please identify the specific Policy terms that Underwriters contend preclude coverage under Clause 82 when J.B. Hunt arranged for the transportation of cargo by a motor carrier it hired and the subject loss occurred while the motor carrier was transporting that cargo.

Second, the December 18th letter is inconsistent in its discussion of the terms of Clause 82. Even though Clause 82 unmistakably refers to "liabilities arising from [J.B. Hunt's] service as a *transportation* broker" (emphasis added), Underwriters' coverage analysis addresses J.B. Hunt's purported liability arising "from its services as a *freight* broker" (emphasis added).[2] Whether intentional or not, this distinction highlights why Underwriters' attempt to limit coverage under Clause 82 for the claims alleged in the Gee Lawsuit is unfounded.

The term "freight broker" is defined in the Policy's general conditions.[3] That definition states that a freight broker "doesn't function as a shipper or carrier." However, the term "freight broker" does not appear in Clause 82. Instead, as noted above, Clause 82 defines its scope of coverage using the term "transportation broker." The Policy provides no separate definition for that term. However, paragraph "A" of Clause 82 indicates that a transportation broker's service

---

[1] See Underwriters' Dec. 18, 2025 reservation of rights letter, p. 8.

[2] See Underwriters' Dec. 18, 2025 reservation of rights letter, p. 8; see also p. 10.

[3] See Policy, p. 13 (stating "'Freight Broker' shall mean an individual or company that serves as a liaison between another individual or company that needs shipping services and an authorized motor carrier. Though a freight broker plays an important role in the movement of cargo, the broker doesn't function as a shipper or a carrier.").

includes the arrangement for the transportation of cargo by a motor carrier for hire, which is exactly what J.B. Hunt did for the shipment at issue in the Gee Lawsuit.

At the same time, no language in Clause 82 states that coverage under Clause 82 will be limited or otherwise excluded once the factual predicate of its insuring agreement is satisfied, (i.e., J.B. Hunt's arrangement for the transportation of cargo by a motor carrier J.B. Hunt hired). Similarly, no language in Clause 82 states that coverage under Clause 82 is inapplicable to liabilities arising from J.B. Hunt's service as a transportation broker if J.B. Hunt also provided other services for the shipment at issue.

Underwriters' decision to use the term "transportation broker" in Clause 82 instead of the expressly and narrowly defined term "freight broker," along with the complete absence of any exclusionary language in Clause 82, means that coverage under Clause 82 cannot be limited by the Plaintiffs' allegation that J.B. Hunt acted as a motor carrier for the subject shipment. This distinction highlights why the trial court's decision on the motion to dismiss, which addressed definitions in the Federal Motor Carrier Safety Regulations and not the Policy, is irrelevant to coverage under Clause 82.

Because J.B. Hunt hired Borderlanders to transport the shipment involved in the Accident, J.B. Hunt necessarily acted as a transportation broker within the meaning of Clause 82. Any liability assessed to J.B. Hunt for the Accident is, therefore, covered under Clause 82. If Underwriters disagree, please explain in writing the complete basis for Underwriters' contention. In doing so, please expressly identify in writing the definition of the term "transportation broker" that Underwriters rely upon to interpret Clause 82. Please produce any item of real or documentary evidence supporting either Underwriters' position or Underwriters' definition of the term "transportation broker."

**_Other Insurance_**

Underwriters' December 18th letter "demand[s] that J.B. Hunt's motor carrier liability insurers and/or the Assured itself on behalf of the $18 million Corridor SIR, are required to respond for this claim conjunction with any coverage which may potentially be provided under the Policy."[4] However, Underwriters provide no support, textual or otherwise, for this contention. J.B. Hunt presumes Underwriters' failure to cite a single Policy term addressing the interaction between coverage provided by Clause 82 and other coverage available to J.B. Hunt stems from the fact that Clause 82 includes no such language. Indeed, no term found in Clause 82 supports the aforementioned demand set forth in Underwriters' letter. Please explain in writing the complete basis for Underwriters' position that J.B. Hunt and/or its motor carrier liability insurers "are required to respond for this claim in conjunction with" Underwriters. Please produce any item of real or documentary evidence supporting Underwriters' position.

---

[4] See Underwriters' Dec. 18, 2025 reservation of rights letter, p. 13.

***Coverage for Punitive Damages***

Underwriters' December 18th letter states that "Underwriters deny coverage for any portion of this claim seeking punitive, exemplary, penalty, or multiple damages."[5] The only Policy provision cited to support Underwriters' position is Clause 40.12. However, Clause 40.12 is found in Section 1 of the Policy, which is titled "Section 1 – Applicable to Freight Services Liability." Section 1 of the Policy is entirely separate from Clause 82, which is found in Section 5 of the Policy and titled "Section 5 – Applicable to Transportation Brokers Liability." No language in Clause 82 incorporates either the punitive damages exclusion in Clause 40.12 or any other provision from any other section of the Policy. Please explain in writing the complete basis for Underwriters' position that coverage under Clause 82 is subject to the punitive damages exclusion in Clause 40.12. Please produce any item of real or documentary evidence supporting Underwriters' position.

Underwriters' coverage position is unsupported by the terms of Clause 82. Simply put, there is no valid basis to limit or deny coverage under Clause 82 for the claims alleged in the Gee Lawsuit, and J.B. Hunt disputes the Underwriters' position otherwise. Consequently, J.B. Hunt requests that the Underwriters withdraw their reservation of rights under Clause 82, fully indemnify J.B. Hunt with respect to the claims alleged against it in the Gee Lawsuit, and extend settlement authority for the upcoming mediation per J.B. Hunt's prior request.

The fact that this letter does not mention or comment upon other agreements, definitions, endorsements, limitations, provisions, terms, conditions or exclusions set forth in the Policy (such as, by way of example only, Clause 80) is in no way intended to be, and shall not constitute, a waiver of the applicability of any agreements, definitions, endorsements, limitations, provisions, terms, conditions or exclusions, which may also exist which are not discussed herein. Nothing stated or not stated herein shall constitute a waiver of any claims, rights, causes of action, rights of action, defenses, positions, or remedies possessed by J.B. Hunt, all of which are expressly reserved.

If you have any questions, please do not hesitate to contact me. Thank you.

With kind regards,

*Chandler L. Smith*

Chandler L. Smith
For the Firm

CLS

---

[5] See Underwriters' Dec. 18, 2025 reservation of rights letter, p. 6.